# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZAIDA HICKS *et al*., individually and on behalf of all others similarly situated, | Case No. 1:22-cv-01989-JPC |
| Plaintiffs, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS CASE** |
| L'ORÉAL USA, INC., | |
| Defendant. | |

Peter G. Siachos
psiachos@grsm.com
JoAnna M. Doherty
jdoherty@grsm.com
**GORDON REES SCULLY MANSUKHANI, LLP**
18 Columbia Turnpike, suite 220
Florham Park, New Jersey  07932
Tel.:  973-549-2500
Fax:  973-377-1911

Miles D. Scully*
mscully@grsm.com
Justin D. Lewis
jlewis@grsm.com
**GORDON REES SCULLY MANSUKHANI, LLP**
101 W. Broadway, suite 2000
San Diego, California  92101
Tel.:  619-696-6700
Fax:  619-696-7124

* *pro hac vice* app. forthcoming

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................. 1

THE CASE REQUIRES DISMISSAL. ........................................................................... 3

I.      Plaintiffs Lack Article III Standing..................................................................... 3

       A.      Plaintiffs Have No Existing Injury-In-Fact Because The Purported Economic Injury Rests On Layers Of Speculation. ............................... 3

              1.      Plaintiffs Only Speculate That Their Mascaras Contained PFAS. ............. 4

              2.      The FAC Does Not Allege Plaintiffs' Mascaras Contained Any Potentially Risky Form of PFAS. .............................................................. 7

              3.      Plaintiffs Do Not Allege Receiving PFAS In Harmful Amounts. ............. 8

              4.      Plaintiffs Allege No More Than Speculation Of Some Future Disease. ................................................................................................... 11

       B.      Plaintiffs Lack Standing To Seek Injunctive Or Other Prospective Relief. ......... 14

II.     Federal Law Expressly Preempts The FAC. .................................................... 14

III.    The FAC Invades The FDA's Primary Jurisdiction. ....................................... 17

IV.    The Liability Theory Lacks A Plausible Foundation........................................ 19

       A.      The FAC Does Not Plead A Plausible Basis For Plaintiffs' Expectation. .......... 20

       B.      Plaintiffs' Own Allegations Render Their Expectations Implausible.................. 23

V.      Even If It Were Plausible, Plaintiffs' Theory Remains Simply Unpled. .......................... 25

IN CONCLUSION................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Akridge v. Whole Foods Mkt. Grp., Inc.*,
  2022 WL 955945 (S.D.N.Y. Mar. 30, 2022) ............................................................. 6

*Axon v. Citrus World, Inc.*,
  354 F. Supp. 3d 170 (E.D.N.Y. 2018) ..................................................................... 22

*Barreto v. Westbrae Natural, Inc.*,
  518 F. Supp. 3d 795 (S.D.N.Y. 2021) ..................................................................... 20

*Berni v. Barilla S.p.A.*,
  964 F.3d 141 (2d Cir. 2020) ................................................................................... 14

*Boysen v. Walgreen Co.*,
  2012 WL 2953069 (N.D. Cal. July 19, 2012) ....................................................... 8, 9

*Chong v. Kind LLC*,
  ___ F. Supp. 3d ___, 2022 WL 464149 (N.D. Cal. Feb. 12, 2022) ......................... 21

*Clapper v. Amnesty Intl. USA*,
  568 U.S. 398 (2013) ......................................................................................... 11, 14

*Conte v. Kingston NH Ops., LLC*,
  585 F. Supp. 3d 218 (N.D.N.Y. 2022) ...................................................................... 5

*Critcher v. L'Oréal USA, Inc.*,
  959 F.3d 31 (2d Cir. 2020) ....................................................................... 2, 15, 17

*DaimlerChyrsler Corp. v. Cuno*,
  547 U.S. 332 (2006) ................................................................................................ 3

*Dashnau v. Unilver Mfrg. (US), Inc.*,
  529 F. Supp. 3d 235 (S.D.N.Y. 2021) ..................................................................... 23

*Doss v. Gen. Mills, Inc.*,
  2019 WL 7946028 (S.D. Fla. June 14, 2019) .......................................... 5, 6, 11, 12

*Ellis Tribune Television Co.*,
  443 F.3d 71 (2d Cir. 2006) ............................................................................... 17, 18

*Fink v. Time Warner Cable*,
  714 F.3d 739 (2d Cir. 2013) ............................................................................. 19, 20

*Gaminde v. Long Pharma Nutrition, Inc.*,
  2019 WL 1338724 (N.D.N.Y. Mar. 25, 2019) .......................................................... 5, 6

*GMO Free USA v. Cover Girl Cosmetics*,
  No. 2021 CA 004786 B (June 1, 2022) .................................................................. 22

*Harris v. Pfizer, Inc.*,
___ F. Supp. 3d ___, 2022 WL 488410 (S.D.N.Y. Feb. 16, 2022) .................................. 20, 21

*Herrington v. Johnson & Johnson Consumer Cos.*,
2010 WL 3448531 (N.D. Cal. Sep. 1, 2010) ................................................................... 8, 12

*Huertas v. Bayer U.S., LLC*,
2022 WL 3572818 (D.N.J. Aug. 19, 2022) ......................................................................... 11

*Hughes v. Chattem, Inc.*,
818 F. Supp. 1112 (S.D. Ind. 2011) .............................................................................. 12, 21

*In Re Amla Litig.*,
320 F. Supp. 3d 578 (S.D.N.Y. 2018) ................................................................................. 10

*In Re Fruit Juice Prods. Mktg. & Sales Practices Litig.*,
831 F. Supp. 2d 507 (D. Mass. 2011) ........................................................................ 4, 8, 14

*In Re Gen. Mills Glyphosate Litig.*,
2017 WL 2983877 (D. Minn. July 12, 2017) ............................................................... 23, 25

*In Re Johnson & Johnson Talcum Powder Prods. Mktg. Sales Pracs. & Liab. Litig.*,
903 F.3d 278 (3rd Cir. 2018) .......................................................................................... 3, 4

*In Re KIND LLC "Healthy and All Natural" Litig.*,
209 F. Supp. 3d 689 (S.D.N.Y. 2016) ................................................................................. 18

*In Re Metformin Mktg. & Sales Pracs. Litig.*,
2022 WL 970281 (D.N.J. Mar. 30, 2022) ............................................................................. 6

*Kimca v. Sprouts Foods, Inc.*,
2022 WL 1213488 (D.N.J. Apr. 25, 2022) ........................................................................... 8

*Koronthaly v. L'Oréal USA, Inc.*,
2008 WL 2938045 (D.N.J. July 29, 2008) .......................................................................... 12

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................................................ 4

*Mantikas v. Kellogg Co.*,
910 F.3d 633 (2d Cir. 2018) .............................................................................................. 21

*Meaunrit v. Pinnacle Foods Grp.*,
*LLC*, 2010 WL 1838715 (N.D. Cal. May 5, 2010) ......................................................... 6, 12

*Moreno v. Vi-Jon, LLC*,
2021 WL 5771229 (S.D. Cal. Dec. 6, 2021) ...................................................................... 23

*Ostermeier-McLucas v. Rite Aid Hdqtrs. Corp.*,
549 F. Supp. 3d 276 (E.D.N.Y. 2021) .......................................................................... 19, 20

*Parks v. Ainsworth Pet Nutrition, LLC*,
2020 WL 832863 (S.D.N.Y. Feb. 20, 2020) ................................................................. 22, 25

iii

*Phoenix Cos., Inc. v. Concentrix Ins. Admin. Sols.*,
   554 F. Supp. 3d 568 (S.D.N.Y. 2021) ................................................................... 7

*Pollock v. Shea*,
   568 F. Supp. 3d 500 (S.D.N.Y. 2021) ................................................................... 5

*Renfro v. Champion Petfoods USA, Inc.*,
   25 F.4th 1293 (10th Cir. 2022) .................................................................... 6, 22

*Rice v. Sunbeam Prods., Inc.*,
   2013 WL 146270 (C.D. Cal. Jan. 7, 2013) ......................................................... 23

*Rugg v. Johnson & Johnson*,
   2018 WL 3023493 (N.D. Cal. June 18, 2018) ................................................... 23

*Schloegel v. Edgewell Personal Care Co.*,
   2022 WL 808694 (W.D. Mo. Mar. 16, 2022) ....................................................... 6

*Song v. Champion Petfoods USA, Inc.*,
   27 F.4th 1339 (8th Cir. 2022) .................................................................... 22, 25

*Souter v. Edgewell Personal Care Co.*,
   542 F. Supp. 3d 1083 (S.D. Cal. 2021) ........................................................ 20, 23

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ................................................................................... 11, 14

*Taradejna v. Gen. Mills, Inc.*,
   909 F. Supp. 2d 1128 (D. Minn. 2012) .............................................................. 18

*Tassy v. Brunswick Hosp. Ctr., Inc.*,
   296 F.3d 65 (2d Cir. 2002) ............................................................................... 18

*TransUnion LLC v. Ramirez*,
   __ U.S. __, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) ......................................... 4

*Wallace v. ConAgra Foods, Inc.*,
   747 F.3d 1025 (8th Cir. 2014) ............................................................................ 6

*Yu v. Dr. Pepper Snapple Grp., Inc.*,
   2020 WL 5910071 (N.D. Cal. Oct. 6, 2020) .................................................. 23, 25

## Statutes

21 U.S.C. § 371(a) .............................................................................................. 17

21 U.S.C. § 379s(a) .................................................................................. 2, 15, 18

21 U.S.C. § 393(b) .............................................................................................. 17

21 U.S.C. § 393(e) .............................................................................................. 17

21 U.S.C. §§ 361-364 .......................................................................................... 12

**Rules**

FED. R. CIV. PROC. 12(b)(1) ................................................................................................ 14

FED. R. CIV. PROC. 8(a) ................................................................................................ 2, 25

FED. R. CIV. PROC. 9(b) ................................................................................................ 2, 25

**Regulations**

21 C.F.R. § 700.27 ................................................................................................ 16

21 C.F.R. § 700.3(e) ................................................................................................ 15

21 C.F.R. § 700.35 ................................................................................................ 16

21 C.F.R. § 701.3(a) ................................................................................................ 15

21 C.F.R. § 701.3(b) ................................................................................................ 16

21 C.F.R. § 701.3(c) ................................................................................................ 16

21 C.F.R. § 701.3(l) ................................................................................................ 15

21 C.F.R. §§ 700.11-700.23 ................................................................................................ 16

21 C.F.R. §§ 700.3-740.19 ................................................................................................ 12

## INTRODUCTION

Given a chance to makeover their allegations, Plaintiffs made only cosmetic amendments to a theory that still lacks foundation. They are mascara consumers concerned about a broad class of chemicals called PFAS. Their case goes like this... Can some types of PFAS cause diseases? Only maybe, says the first amended complaint ("FAC"). Did Plaintiffs' own mascaras make them sick? No. Did they hold the slightest trace of any PFAS impurities? The FAC pleads unfounded "information and belief," meaning Plaintiffs have no idea. What identifiable and possibly risky form(s) of PFAS, if any, did Plaintiffs' purchases contain? The FAC doesn't say. In what amounts? Answer: "_____." More than the faintest few, legally inert molecules? Again, silence. Did Plaintiffs pay for, receive, and enjoy beautiful mascaras? No dispute there. "Therefore, and in conclusion," to paraphrase their theory, "disgorge all the money."

The plaintiffs' bar and legal observers consider this putative consumer class action a pioneering test case for an overreaching liability theory. If ordained in this Court, it will open a novel and wide frontier of litigation against every maker and seller of personal care and food products whose goods carry *merely a chance* of containing the tiniest detectable molecular traces of thousands of chemical substances Plaintiffs say already intractably pervade Earth's waters, animals, and the rest of the environment. *E.g.*, FAC, ¶ 44 (alleging "thousands of unique" PFAS), ¶ 42 ("used for decades"), ¶ 44 (are "highly persistent in the environment"), ¶ 381 (meaning products "risked containing"), ¶ 21 ("detectable" traces).

The case requires dismissal for multiple reasons. First, Plaintiffs have no injury, physical or economic. Their FAC expounds a theory of merely potential injury so exquisitely speculative it transcends the limited jurisdiction the Constitution vests in federal courts to decide live, actual controversies. It seeks an advisory opinion: whether Plaintiffs should get refunds *if* it turns out their mascaras contained any PFAS, *if* it was a form of PFAS with a possibly risky character, *if* in turn it was present above some unpled, non-trivial, potentially risky quantity, *if* this speculative exposure might someday lead Plaintiffs to actually develop one of various diseases? Article III does not permit a claimant to stand on these strata of conjecture.

1

Beyond that, federal law expressly preempts the FAC.  Each claim posits that state law requires L'Oréal and other manufacturers to specially label cosmetics if they contain or even might contain a form of PFAS.  Yet, the Food, Drug, and Cosmetic Act invalidates requirements of state law that are "different," "not identical," or "in addition to" to federal cosmetic labeling requirements.  21 U.S.C. § 379s(a).  The Second Circuit recently made clear that statute's plain text means exactly what it says when other plaintiffs likewise claimed that state consumer law required L'Oréal to label cosmetics differently.  *Critcher v. L'Oréal USA, Inc.*, 959 F.3d 31, 35-36 (2d Cir. 2020) (affirming dismissal with prejudice where complaint asserted purported state labeling obligations about contents of cosmetics not "exactly the same" as federal law).  This case, too, wields state law to impose preempted requirements on a subject that federal law regulates closely:  labeling obligations respecting the composition of consumer cosmetics.

The FAC also invades the FDA's primary jurisdiction.  Regulators are just beginning to consider whether and how policy should evolve in response to new and inconclusive research about PFAS.  To suit a class action, Plaintiffs want to freeze-frame the science now to take an early, blurry daguerreotype.  They then ask the Court to trace six states' laws on top, drawing new labeling policy for a nationwide cosmetics industry.  To monitor, digest, and resolve emerging questions of PFAS science into the technical dimensions of a uniform, national policy for cosmetics is beyond the traditional role of courts.  Congress entrusted that process to the FDA's special expertise.  The Court should defer to it.

Beside threshold barriers of jurisdiction and preemption, the case's liability theory is implausible and unpled under either Rule 8(a) or the governing Rule 9(b).  Each claim ultimately depends on Plaintiffs' expectation that their mascaras were certain not to contain a trace of any form of PFAS, but the FAC does not allege a plausible, objective basis for that expectation.  L'Oréal made no such representation.  The mascaras' labeling says nothing at all about PFAS.

More than merely failing to plead it with plausibility, the FAC self-precludes its theory of consumer expectation.  It alleges that thousands of unique forms of PFAS, used by industry for decades, have come to widely pollute water sources and the rest of the environment on a

cumulative, even permanent basis.  Of course, every raw material ever used to make cosmetics and other consumer products comes from the same environment Plaintiffs pose as persistently suffused by PFAS.  They can't plausibly expect consumer products to be utterly free of any PFAS molecules, especially with no such promise on the label.  By their own theory, they should've expected PFAS in the water their counsel's laboratory used to wash its test tubes.

In sum, if Plaintiffs bargained for beautiful mascaras that would make them prettier and not injure them, that's exactly what they got.  Neither their subjective buyers' remorse nor speculative unease about a chance trace of PFAS gives them Article III standing to assert their expressly preempted and implausible liability theory.  If, as they say, possibly risky forms of PFAS have spread throughout the environment and its raw materials, then it is up to the FDA or Congress to answer the emerging research with uniform, national standards for consumer products.  The Court should turn down Plaintiffs' invitation to intercede and fashion new labeling policy via state law.  For all these reasons, the Court should dismiss this case.

## THE CASE REQUIRES DISMISSAL.

## I.      Plaintiffs Lack Article III Standing.

It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).

### A.      Plaintiffs Have No Existing Injury-In-Fact Because The Purported Economic Injury Rests On Layers Of Speculation.

Plaintiffs lack standing to seek monetary or other retrospective relief because they do not plausibly allege a concrete and particularized injury-in-fact.  Though the FAC wholly depends on allegations that some forms of PFAS might be linked to some two dozen diseases, Plaintiffs do not claim that the mascaras caused them (or anyone else) a physical injury.  *In Re Johnson & Johnson Talcum Powder Prods. Mktg. Sales Pracs. & Liab. Litig*., 903 F.3d 278, 289-290 (3rd Cir. 2018) ("Although [plaintiff] contends that Baby Powder is 'unsafe,' her own allegations require us to conclude that the powder she received was, in fact, *safe as to her*" since she "did not allege that she developed ovarian cancer" or that "she is at risk of developing [it]").  Nor do

Plaintiffs complain that the mascaras failed to embellish their lashes or weren't waterproof. Despite their subjective buyers' remorse, they have no economic injury because they got exactly what they claim they bargained for:  waterproof mascaras that beautified them without physical injury.  *In Re Fruit Juice Prods. Mktg. & Sales Practices Litig.*, 831 F. Supp. 2d 507, 510-511 (D. Mass. 2011) ("The fact is that Plaintiffs paid for fruit juice, and they received fruit juice, which they consumed without suffering harm," despite alleged lead contamination).

The Court could stop there.  But, if it looks past those realities, the Court would find that Plaintiffs' own telling of their supposed economic injury rests on multiple layers of speculation, each exiling the FAC from Article III.  *TransUnion LLC v. Ramirez*, __ U.S. __, 141 S.Ct. 2190, 2210, 210 L.Ed.2d 568 (2021) (class members whose credit files were not actually disseminated to third-parties did not suffer Article III "concrete harm"); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992) ("the party seeking review [must] be himself among the injured"); *Johnson & Johnson*, 903 F.3d at 289-290 ("references to Baby Powder being unsafe *as to others* are not relevant to determining whether [plaintiff] has standing *herself*" to assert economic injury).

Plaintiffs say they paid for mascaras they believed would not possibly contain a trace of any potentially pathogenic form of PFAS.  Yet, nowhere do Plaintiffs allege that their own mascaras (1) actually contained any form of PFAS that they can identify, much less (2) a potentially risky form (3) at levels (4) likely to cause future disease.  The supposed economic injury is a chain of conjecture and hypothesis, not the actual, concrete, and particularized injury-in-fact that Article III demands.  They say L'Oréal must pay refunds because their mascaras *might or might not* have contained PFAS of a form that *might or might not* have pathogenic qualities, and it *might or might not* have been present in amounts that *might or might not* actually cause Plaintiffs or anybody else to develop future disease.  That is speculation, not injury-in-fact.

### 1.     Plaintiffs Only Speculate That Their Mascaras Contained PFAS.

Despite their burden to plead a particularized injury, Plaintiffs do not plausibly allege that their units of mascara contained a single molecule of any form of PFAS.  Where the original complaint made no such allegation at all, the FAC now interposes a bald, speculative conclusion.

4

Plaintiffs now allege their unadorned "information and belief" that their own mascara purchases contained some unpled form(s) of PFAS.  *E.g.*, FAC, ¶ 158.  Even still they hedge their bets, backtracking to concede there may have been only a "risk of containing" PFAS.  *Id*. at ¶¶ 375, 376; *id*. at ¶ 383 ("risked containing PFAS").  Such conclusory allegations do not plead standing.  *Gaminde v. Long Pharma Nutrition, Inc*., 2019 WL 1338724, at *2 (N.D.N.Y. Mar. 25, 2019) ("conclusory and unsubstantiated allegation that 'the CVS Krill Oil purchased by [plaintiff] was mislabeled in that it did not contain 300mg of Omega-3 Krill Oil'"); *Doss v. Gen. Mills, Inc*., 2019 WL 7946028, at *2 (S.D. Fla. June 14, 2019) (*affirmed* 816 Fed. Appx. 312) (dismissal where plaintiff alleged her box of Cheerios "contained or could contain glyphosate").

What is the plausible basis for Plaintiffs' hesitant "information and belief" about their purchases?  There is none.  It is not chemical testing, because Plaintiffs nowhere allege that their counsel's laboratory found a single molecule of PFAS in Plaintiffs' units of mascara.  To be sure, allegations that tests found PFAS in *other* units that counsel procured for litigation purposes do not provide a plausible, non-speculative basis to conclude Plaintiffs' own mascaras held PFAS.

There is no indication that counsel's laboratory tested a representative sample of any of the six disputed product lines.  The lack of such allegations is especially glaring because the FAC conspicuously does *not* contend that L'Oréal uses any PFAS intentionally as ingredients.  Rather, it concedes that PFAS can trace to "impurities" and "degradation" (FAC, ¶ 79), phenomena facially capable of varying from lot to lot based on differences in raw material sourcing, manufacture, storage, or distribution.  *See also* Ex. 1 at 2[1] ("raw material impurities").  So thin are the testing allegations, they leave open the likelihood that Plaintiffs' counsel had to buy dozens of units to test before their lab found the faintest trace of PFAS in the slimmest few.

In short, the testing allegations do not permit an inference that even an appreciable

---

[1] Citations to exhibits refer to the ECF-stamped page numbers.  On a Rule 12 motion, "the court may consider documents that are referenced in the complaint" and "matters of which judicial notice may be taken."  *Pollock v. Shea*, 568 F. Supp. 3d 500, 506 (S.D.N.Y. 2021).  Materials published on government websites are fit for judicial notice.  *Conte v. Kingston NH Ops. LLC*, 585 F. Supp. 3d 218, 235 (N.D.N.Y. 2022).

minority of units of any of the mascaras contained PFAS impurities, let alone that Plaintiffs' own mascaras did. *Gaminde*, 2019 WL 1338724 at *2 ("[I]t is speculation to allege that because two CVS Krill Oil bottles in a USDA study were found to have less than the stated amount of Omega-3 Krill Oil, the bottle that [plaintiff] purchased must as well."); *Doss*, 2019 WL 7946028 at *2 (dismissal where plaintiff did not plausibly allege that her own Cheerios contained glyphosate, "just that some Cheerios that have been tested do"); *see also Wallace v. ConAgra Foods, Inc.,* 747 F.3d 1025, 1030-1031 (8th Cir. 2014) (no standing "[w]ithout any particularized reason to think the consumers' own [hotdogs] actually exhibited the alleged non-kosher defect").

      Plaintiffs have now failed a second time to plausibly allege that their own mascaras contained any trace of PFAS. They therefore fail to plead even the first step of their theory of injury: that L'Oréal sold them cosmetics with any form of PFAS at all. *E.g.*, *Akridge v. Whole Foods Mkt. Grp., Inc*., 2022 WL 955945, at *5-*8 (S.D.N.Y. Mar. 30, 2022) (despite allegations of "systemic" sales of food containing undisclosed allergens, no standing to assert economic injury where plaintiff did not plausibly allege "that he actually purchased products containing unidentified allergens," meaning he "ask[s] the Court to infer an injury for him"); *Renfro v. Champion Petfoods USA, Inc*., 25 F.4th 1293, 1305 (10th Cir. 2022) (despite contention that dog food "contained and/or had a material risk of containing pentobarbital," plaintiffs "could not have suffered any consumer protection injury if they had not purchased dog food containing" it); *In Re Metformin Mktg. & Sales Pracs. Litig.*, 2022 WL 970281, at *3 (D.N.J. Mar. 30, 2022) ("without any allegations that [plaintiffs] actually purchased [drugs] that were contaminated with NDMA, they lack standing to bring such a class action"); *Schloegel v. Edgewell Personal Care Co*., 2022 WL 808694, at *2-3 (W.D. Mo. Mar. 16, 2022) ("Plaintiff has failed to allege that she actually purchased [sunscreens] which were adulterated with benzene, and thus has failed to allege that she did not receive exactly what Edgewell promised: an unadulterated sunscreen product"); *Meaunrit v. Pinnacle Foods Grp., LLC*, 2010 WL 1838715, at *2-3 (N.D. Cal. May 5, 2010) (no standing to assert a "speculative, hypothetical" theory of "economic injury" alleging that pot pies only "might contain harmful pathogens").

**2.     The FAC Does Not Allege Plaintiffs' Mascaras Contained Any Potentially Risky Form of PFAS.**

Beyond Plaintiffs' failure to plausibly allege their own mascaras contained *any* PFAS whatsoever, they also do not allege *what substance(s)* their units of mascara contained.[2]  There is no basis in the FAC to conclude that Plaintiffs' cosmetics contained one of the forms of PFAS belonging to a risky subset.  Critically, PFAS are not a single chemical, but, according to the FAC, an entire group of "thousands of unique" substances.  FAC, ¶ 44.  The original complaint asserted that only *some* may have a pathogenic character.  Dkt. 1, ¶ 44 ("*Many* PFAS…are toxic"); *id.* ("Exposure to *certain PFAS*") (emphases added).  The FAC now seeks to amend that away, falsely posing all of several thousand PFAS as found to be dangerous and equally so.  It thereby contravenes, implausibly, the very scientific and regulatory sources it depends on and incorporates to construct its liability theory.[3]  *E.g.*, FAC, ¶ 64 (EPA has issued a non-binding drinking water advisory for only four specific compounds).  Indeed, the FAC's primary source says science has studied the potential health effects only of a "select few" PFAS (Ex. 6 at 8), yielding "[i]nsufficient information to properly assess human health risk across the entire structural class" (*id.* at 9), so it remains unknown "whether" PFAS share "common or overlapping patterns of toxicity."  *Id.* at 10.  Its other key source asserts PFAS "do not all have the same biological persistence and toxicity."  Ex. 7 at 4.  Rather, "different PFAS have distinct physical, chemical, and toxicological properties."  *Id.* at 5; *e.g.*, *id.* at 7 (some "have a relatively long biological half-life" while others last only "days").

Similarly, the EPA advises only "some" "may be linked" to health effects, but the potential risk is "challenging to study and assess" because there are "thousands of PFAS chemicals…found in many different consumer, commercial, and industrial products."  Ex. 4 at 3.  The FDA "has identified" only "certain" types of PFAS "as having potential safety concerns."

---

[2] The FAC's paragraphs 98-99 and 118 are the only allegations that name identifiable chemicals in the same breath as any L'Oréal mascaras.  However, nowhere does the FAC assert that Plaintiffs' own mascaras actually contained PFOA, PFHxA, PFDoS, NEtFOSE, or AOF.
[3] The Court need not credit assertions contradicted by documents upon which the FAC relies.  *Phoenix Cos., Inc. v. Concentrix Ins. Admin. Sols.*, 554 F. Supp. 3d 568, 585 (S.D.N.Y. 2021).

Ex. 2 at 3.  It calls them a "diverse group" (*id*. at 2), some of which it *authorizes* in food applications.  Ex. 3 at 2, 3.  Despite this, the FAC still does not plead what member(s) of the voluminous PFAS category Plaintiffs' units of mascara supposedly contained.  Instead, they ask the Court to speculate that they purchased units containing a form found to carry potential risk.

### 3.   Plaintiffs Do Not Allege Receiving PFAS In Harmful Amounts.

Next, let's assume Plaintiffs plausibly alleged their units of mascara contained forms of PFAS and named them.  Even then, they haven't alleged receiving PFAS in *amounts* likely to risk, let alone cause, disease when present in mascara.  *See Fruit Juice*, 831 F. Supp. 2d at 511, 512 (dismissing theory of economic injury from lead contamination in fruit juice where plaintiffs "have not claimed that any particular amount in the products is dangerous, and have not alleged that any specific amount has caused actual injuries to any plaintiff").  For its part, the FDA has announced that "the only risk assessment that has evaluated PFAS in cosmetics" found that even "relatively *high concentrations*" of five forms of PFAS "impurities that were detected in the largest number" of cosmetics were "unlikely to pose a health risk."  Ex. 1 at 2 (emphasis added).

The FAC attempts to frame a theory of injury at odds with the FDA's outlook, but fails to allege what levels of which PFAS in consumer cosmetics are necessary to the development of disease, or that Plaintiffs' (or anyone's) units of mascara actually exceeded those thresholds. This is fatal to their claims.  *Kimca v. Sprouts Foods, Inc*., 2022 WL 1213488, at *8 (D.N.J. Apr. 25, 2022) (though plaintiffs alleged that baby foods "contain heavy metals" and "that elevated levels of heavy metals can be unsafe and dangerous," "they do not connect these two allegations by establishing that the levels of heavy metals in the Baby Food Products are unsafe"); *Boysen v. Walgreen Co*., 2012 WL 2953069, at *7 (N.D. Cal. July 19, 2012) (no economic injury where fruit juice consumer pled "that arsenic and lead are harmful toxins, and that the products contain those toxins," but not "that the levels of lead and arsenic contained in defendant's juices are likely to cause physical harm," even though, unlike here, he alleged "material and significant levels"); *Herrington v. Johnson & Johnson Consumer Cos*., 2010 WL 3448531, at *3, *4 (N.D. Cal. Sep. 1, 2010) (no economic injury where consumers of children's bath products alleged only

that supposed toxins "*may* be carcinogenic for humans, that there *could* be no safe levels for exposure to carcinogens and that Defendants' products contain some amount of these substances") (emphasis original).

As discussed above, the FAC does not plausibly allege that Plaintiffs' purchases contained any form(s) of PFAS, much less identify them.  Consequently, it necessarily also fails to plead that Plaintiffs' units of mascaras contained pathogenic *quantities* of any risky form of PFAS.  Further, even if their counsel's lab testing bore some relevance to Plaintiff's own particularized standing, those allegations do not plead, let alone plausibly, that any unit of mascara contained concentrations of PFAS sufficient to pose danger.

In that regard, the FAC gestures to the EPA's health advisory levels for four specific forms of PFAS in drinking water.  FAC, ¶¶ 64, 100.  Of course, Plaintiffs must resort to an inapplicable EPA drinking water standard because the agency with actual jurisdiction of cosmetics' safety has announced findings that even "relatively high concentrations" of PFAS in cosmetics are "unlikely to pose a health risk."  Ex. 1 at 2; *see Boysen*, 2012 WL 2953069, at *6.

Apart from the EPA drinking water advisory levels' inapplicability to cosmetics, the FAC grossly oversells their meaning.  An EPA health advisory "identif[ies] the concentration of a contaminant in drinking water at which adverse health effects…are *not anticipated* to occur over specific exposure durations (e.g., 1 day, 10 days, a lifetime)."  Ex. 8 at 3 (emphasis added). Exactly opposite to the false impression the FAC conjures, a lifetime advisory level does *not* mean that one drink of water contaminated above the advisory level exceeds a lifetime's worth of the maximum safe exposure to the contaminant.  *Id*.  Rather, it means that one can drink water contaminated at or below the health advisory level *for a lifetime* and still expect no adverse health effects.  *Id*.  Even then, the advisory levels err decidedly on the side of caution.  Ex. 9 at 2 (they are "calculated to offer a margin of protection against adverse effects" and "take into account other potential sources of exposure to these PFAS beyond drinking water," "which provides an additional layer of protection").  Thus, if levels of drinking water contamination exceed an advisory level, it simply means the EPA is unable to make its safety assurance about a

9

lifetime of drinking that water. Depending on the level and how frequently one drinks it, it might be safe, or might not. *See* FAC, ¶ 21 (effectively admitting as much by alleging that excess levels merely "can" be toxic).

That background makes clearer the FAC's compound failures to allege what level(s) of what PFAS in mascaras pose potential danger, or that Plaintiffs' or *any* units of the six lines of disputed mascaras exceeded those levels. Paragraph 100 says that samples of some unnamed mascara product lines contained unidentified forms of PFAS "beyond" the EPA drinking water advisory levels. The EPA has set drinking water advisory levels only for PFOA, PFOS, GenX, and PFBS. FAC, ¶ 64. In turn, the only one of those Plaintiffs say their lab found in any L'Oréal mascara is PFOA. *Id.* at ¶ 99. The EPA drinking water advisory level for PFOA is 0.004 parts per trillion, which the FAC calls below the limit of detection. *Id.* at ¶¶ 64, 21.

If those allegations seem like a shell game, their purpose is to make the non-actionable reality sound superficially complex. All they stand for is the proposition that Plaintiffs' lab found at least the faintest detectable trace of PFOA, but in some unpled amount, in some of the litigation samples they tested. Even if the EPA cannot positively assure the safety of drinking the equivalent trace of PFOA in tap water for a lifetime, that hardly means a mascara brushed onto lashes is dangerous if it contains more than four thousandths of a single PFOA molecule among a trillion harmless others, least of all when each Plaintiff has stopped buying the mascaras after considerably less than a lifetime's use. *See* part I. B., *infra*.

 Plaintiffs cannot avoid conceding that trivial exposures are factually and legally meaningless. *In Re Amla Litig.*, 320 F. Supp. 3d 578, 585 (S.D.N.Y. 2018) (where consumers asserted economic injury in buying hair relaxer kit, "a loss of molecular structural integrity that the user does not even notice is not actionable," "much less the type of injur[y] that would render the product unreasonably dangerous"). Their FAC acknowledges some "level" or "quantity" of PFAS would be necessary for PFAS in mascaras to pose the health risks they supposedly bargained to avoid. FAC, ¶¶ 21, 55. Even if those levels are "very" or "extremely low" (*id.*), nowhere do Plaintiffs allege they received mascaras with a risky form of PFAS at or above those

levels. *Huertas v. Bayer U.S., LLC*, 2022 WL 3572818, at *6 (D.N.J. Aug. 19, 2022) (allegation that products "'expose consumers to benzene well above the legal limit' is conclusory" and "fails to…even allege the amount that existed" in the products); *id*. (alleging there's "probably no safe level of exposure" was "speculation"); *Doss*, 2019 WL 7946028, at *2-3 ("no allegation that the cereal [plaintiff] purchased even contains glyphosate, never mind harmful levels of it," where plaintiff did "not define 'ultra-low levels' at which "glyphosate, in oats, cause[s] harm" or allege that her cereal exceeded that level).

### 4. Plaintiffs Allege No More Than Speculation Of Some Future Disease.

Plaintiffs' economic injury theory falters on still another shaky layer of speculation: the alleged links between some forms of PFAS and the risk of future health problems. Plaintiffs say the risk of a future physical injury is what makes their payments of purchase prices into present, existing injuries-in-fact. However, the threat of that future physical injury is itself "conjectural or hypothetical," not "actual and imminent," much less "certainly impending," as Article III requires for theories of future injury. *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009); *Clapper v. Amnesty Intl. USA*, 568 U.S. 398, 402, 407 (2013). Indeed, the Supreme Court has made clear that fear of "hypothetical future harm that is not certainly impending" "cannot manufacture standing" to pose past expenditures of money as present injuries-in-fact traceable to a defendant's conduct. *Id*.; *id*. at 418 ("subjective fear" of merely potential future surveillance "does not give rise to standing" based on costs already incurred to avoid surveillance).

The FAC alleges merely that unspecified forms of PFAS are "associated" or "correlated" with various conditions, are "possibly carcinogenic," or lead to "increased risk" of disease. FAC, ¶¶ 55-58; *id*. at ¶ 21 ("can have adverse effects"). In fact, the only PFAS it links by name to disease are PFOA and PFOS, but even those compounds' alleged risk is similarly up for debate. *Id*. at ¶¶ 50, 56 ("likely" or "possibly" carcinogenic).[4] The FAC gives no indication by

---

[4] Even then, the IARC monograph the FAC incorporates says there's only "*limited evidence*" in humans or lab animals that PFOA is carcinogenic. FAC, ¶ 56, fn. 16, §§ 6.1, 6.2 (emphasis original). And, the FAC does not allege that any mascaras contained PFOS, let alone *Plaintiffs'*.

how much -- or by how immaterially little -- exposure to PFOA, PFOS, or any other form of PFAS in mascara might increase a consumer's future chances of developing a disease.

Yet, "[m]ere conjecture that something has the potential to be harmful is not enough." *Doss*, 2019 WL 7946028, at *3 (dismissal where plaintiff alleged only that "glyphosate *may* be harmful to human health' and that the World Health Organization classifies glyphosate as a '*probable* human carcinogen'") (emphases original) (internal citations omitted).  The various hypothetical health risks underlying Plaintiffs' economic injury theory are "far too speculative to manufacture standing in this case."  *Id*.; *Herrington*, 2010 WL 3448531, at *3, *4 (similar dismissal where plaintiff claimed alleged toxin in child bath product "*may* be carcinogenic"); *Pinnacle Foods*, 2010 WL 1838715, at *2-3 (similar dismissal where plaintiff alleged potentially contaminated pot pies "*could* cause illness" if undercooked) (emphasis added); *Hughes v. Chattem, Inc.*, 818 F. Supp. 1112, 1119-1120 (S.D. Ind. 2011) (similar).

An earlier L'Oréal case is instructive.  In *Koronthaly v. L'Oréal USA, Inc*., 2008 WL 2938045 (D.N.J. July 29, 2008) (*affirmed* 374 Fed. Appx. 257 (3d Cir. 2010)), the court dismissed an economic injury theory for lack of standing, even though that plaintiff actually "purchased lipstick containing lead" at specific levels, quite unlike Plaintiffs' lesser allegations here.  *Id*. at *1.  However, the mere "potentiality" of a lead-associated future injury was "both conjectural and hypothetical" (*id*. at *4) and "d[id] not provide [plaintiff] with an injury-in-fact," especially since the FDA "does not provide limitations on lead levels in lipstick."  *Id*. at *5.  That is why "[c]ases analogous to the present matter have routinely failed."  *Id*. at *5.  In the end, "Plaintiff bought lipstick and used the lipstick, only complaining that the lipstick's levels of lead are unsatisfactory to her," a grievance Article III does not recognize.  *Id*.

The FDA's outlook on PFAS is relevant when assessing whether Plaintiffs' apprehension about future disease reflects certainly impending injury or hypothetical conjecture.  *See Koronthaly*, 2008 WL 2938045 at *5.  Neither the FDA nor FDCA ban or limit PFAS in cosmetics (FAC, ¶ 101 (admitting this)), or require any special labeling for PFAS.  *See generally* 21 U.S.C. §§ 361-364; 21 C.F.R. §§ 700.3-740.19.  Rather, the FDA's latest statement suggests

it remains unknown whether and to what extent PFAS in cosmetics might have future health effects.  As yet, "[t]here have been few studies on the presence of PFAS in cosmetics."  Ex. 1 at 2.  If anything, the agency downplays the merely "potential health risks," singling out one study for special, reassuring emphasis.  *Id.*  According to the FDA, research in 2018 found that "levels of PFAS in the individual [cosmetics] tested are *unlikely* to pose a health risk," even though researchers found "relatively *high concentrations*" of "five different types of PFAS impurities" "detected in the largest number of different cosmetic products."  *Id.* (emphases added).

The FDA looks to "[a]dditional research" to determine (1) "toxicological profiles for PFAS in cosmetics"; (2) "the extent to which various PFAS in cosmetics can be absorbed through the skin"; and (3) "the *potential* for human health risks from this type of exposure."  Ex. 1 at 3 (emphasis added).  "As the science on PFAS in cosmetics continues to advance," the agency is monitoring cosmetic ingredient data, taking account of "published research," and planning to "collaborate" in "research to fill data gaps."  *Id.*  So, the key agency with jurisdiction of cosmetics' safety says open questions abound concerning a merely potential risk.

Aside from cosmetics, the FDA also regulates food contact substances, which it regards as food additives because they can migrate into food.  Ex. 3 at 2-3.  The FDA affirmatively *authorizes* certain PFAS in food contact substances, having found to a "reasonable certainty" in a "rigorous scientific review" of a continuous, ongoing nature that the authorized PFAS pose no threat of harm.  *Id.*  Thus, Plaintiffs' theory of economic injury asks the Court to assume that PFAS portend certainly impending physical danger when swept onto eyelashes, while simultaneously harmless to ingest as food additives.[5]

The supposed causal link between cosmetic PFAS and future disease is an indispensable premise of Plaintiffs' theory of economic injury:  it is what supposedly makes their purchase prices the injurious proceeds of consumer fraud.  However, it amounts to conjecture, not the actual, certainly impending injury Article III demands for claims predicated on prospective

---

[5] Similarly, the FAC states that the EPA does not ban or limit PFAS in water supplies (FAC, ¶ 63), although it is alert to claims of potential health risk.  Ex. 4 at 3.

13

threats. *Clapper*, 568 U.S. at 407, 418; *Fruit Juice*, 831 F. Supp. 2d at 510-511, 512-513 (claim of exposure to "potential adverse health effects" or "potential harm" is "insufficient for Article III standing," whether asserted as future injury or as basis of economic injury at purchase).

In all, Plaintiffs' theory of existing injury is a medley of hypothetical questions:  should Plaintiffs get refunds *if* their mascaras contained PFAS, *if* it was a potentially pathogenic form of PFAS, *if* it was present in concentrations above a certain minimum level required to pose risk, *if* it was then actually likely to cause future injury?  That is speculation on top of conjecture.

### B.    Plaintiffs Lack Standing To Seek Injunctive Or Other Prospective Relief.

All claims for injunctive and declaratory relief also require Rule 12(b)(1) dismissal because Plaintiffs lack Article III standing to seek prospective remedies.  They have "stopped using" the mascaras (*id*. at ¶¶ 138, 148, 159, 171, 183, 195, 207, 219, 231, 255, 267, 279, 292; *id*. at ¶ 243 ("discontinued use")), and now wise to their alleged deception, cannot be deceived anew, blocking any "actual and imminent, not conjectural or hypothetical" threat of future harm. *Summers,* 555 U.S. at 493; *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147-148 (2d Cir. 2020) ("past purchasers of a product…are not likely to encounter future harm" required for injunctive relief because "they will not again be under the illusion" that originally deceived them).

## II.   Federal Law Expressly Preempts The FAC.

The FAC fails by express preemption because it wields state law to impose special cosmetic labeling requirements regarding PFAS that federal law does not.  In particular, the FDCA precludes Plaintiffs' claims that state law required the mascaras' ingredient lists to disclose PFAS as impurities, unintended ingredients, or merely potentially present.  The FDCA similarly bars Plaintiffs' claims that cosmetic manufacturers must make some other disclosure about PFAS outside the ingredient list, or that state law requires them to remove or avoid other labeling that supposedly becomes misleading absent some special PFAS disclosure.

Federal law expressly preempts any aspect of state law that would impose a labeling requirement for consumer cosmetics not required by federal law.  In particular, the FDCA forbids the states to "establish or continue in effect any requirement for labeling or packaging of

a cosmetic that is different from or in addition to, or that is otherwise not identical with, a requirement specifically applicable to a particular cosmetic or class of cosmetics under [the FDCA]." 21 U.S.C. § 379s(a). This furthers the FDCA's purpose of "national uniformity" under "a comprehensive regulatory scheme governing…the ingredients, packaging, and marketing of cosmetic products." *Critcher*, 959 F.3d at 35.

Cosmetic preemption's extraordinary scope extends well beyond requirements of state law in conflict with federal law. Indeed, the statute expressly precludes any state law obligations "different" from, "not identical with," or merely "in addition to" federal cosmetic labeling requirements. 21 U.S.C. § 379s(a). In a recent L'Oréal labeling case, the Second Circuit made clear that cosmetic preemption invalidates "*any* state law that provides for labeling requirements that are not *exactly the same* as those set forth in the FDCA and its regulations (*i.e.*, any law that is 'in addition to' the FDCA)." *Critcher*, 959 F.3d at 35-36 (emphasis original) (affirming dismissal with prejudice of theory that state law required a special labeling disclosure to warn consumers that allegedly defective pump bottles would not fully dispense makeup).

The FDA intricately regulates labeling requirements concerning the chemical composition of consumer cosmetics. The rules are technical. As relevant here, they require manufacturers to print an ingredient list declaring each ingredient in descending order of prominence. 21 C.F.R. § 701.3(a) ("The label of each package of a cosmetic shall bear a declaration of the name of each ingredient…"). "[I]ngredients" subject to declaration are only those intentionally "*used as a component* in the manufacture of a cosmetic product." 21 C.F.R. § 700.3(e) (emphasis added); *see* dkt. 1, ¶ 66. Exempt from disclosure are ingredients that are only "incidental." 21 C.F.R. § 701.3(l). And the FDA does not require an ingredient list to name substances that are not "used" as components, like impurities, or substances that only *might* be present. 21 C.F.R. § 701.3(a) (no such requirements); FAC, ¶¶ 138, 148, 279, 292, 375, (alleging a "risk of containing" PFAS). In that regard, the FDA recognizes that PFAS may "be present in cosmetics unintentionally as the result of raw material impurities." Ex. 1 at 2. Plaintiffs do, too. FAC, ¶ 79. For ingredients that require disclosure, the regulations

15

choreograph their manner of naming and listing in close detail.  Ingredients must be shown "in letters not less than 1/16 of an inch."  21 C.F.R. § 701.3(b).  Regulations also dictate what precise names the list must use.  21 C.F.R. § 701.3(c) (cascade of various regulatory or technical sources and conventions fixing cosmetic ingredient names).

Beyond this obligation to list all non-incidental, intentional ingredients using FDA-prescribed nomenclature, the FDA has also imposed greater, additional obligations *vis-a-vis* certain cosmetic substances, including outright bans.  It maintains additional regulations regarding bithionol, mercury compounds, vinyl chloride, halogenated salicylanilides, zirconium, chloroform, methylene chloride, chlorofluorocarbons, certain materials derived from cattle, and sunscreen ingredients.  21 C.F.R. §§ 700.11-700.23, 700.27, 700.35.  By contrast, the agency does not impose any additional regulations or labeling requirements for cosmetics that contain PFAS as ingredients or impurities, or that carry a "risk" of containing PFAS.  *See id.*; FAC, ¶ 101 (admitting "no laws or regulations governing allowable levels of PFAS in cosmetics").

Against that regulatory backdrop, the express federal preemption emerges.  Whether framed as a theory of omission or misrepresentation, the FAC's charge is that state law requires special, supra-federal, PFAS-related labeling.  As for the pure omission theory, there are only two areas on the mascara products where a PFAS-related disclosure can appear:  either the ingredient list or somewhere else in the labeling.  FAC, ¶ 77.  Yet, nothing in the FDCA or corresponding FDA regulations requires cosmetic manufacturers to make a labeling disclosure regarding PFAS anywhere outside the cosmetic ingredient list, and the FAC does not allege that L'Oréal uses PFAS as intentional ingredients subject to disclosure in the ingredient list.  Nor does federal law require a cosmetic ingredient list to name incidental PFAS ingredients, disclose PFAS impurities, or warn of a potential trace of PFAS.  Similarly preempted, the FAC's misrepresentation angle claims that state law imposes proscriptive requirements to avoid or delete the challenged labeling statements (excerpted in footnote 10, below), unless the labeling also bears some disclosure about PFAS not required by federal law.  *E.g.*, *id.* at ¶¶ 127, 140.

In all, the FAC relies on purported requirements of state law that are not "exactly the

same" as federal requirements for labeling concerning the composition of cosmetics. *Critcher*, 959 F.3d at 35.  Its claims are "using state law to impose labeling requirements on top of those already mandated in the FDCA and the regulations promulgated thereunder." *Id.* at 36.  As such, federal law expressly preempts them, another basis for dismissal. *Id.*

## III.   The FAC Invades The FDA's Primary Jurisdiction.

Hearing this case will entangle the Court in technical policymaking reserved to the FDA's primary jurisdiction.  Whether the law should permit which forms of PFAS, in what levels, in which consumer cosmetics, with what labeling disclosures, are matters of public policy dependent on developing science, poorly suited for judicial resolution.  Congress committed them to the FDA's expertise and authority.  As such, the Court should dismiss the case for invading the FDA's primary jurisdiction.  That doctrine "promot[es] proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Ellis Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (internal quote omitted).  It applies "whenever a claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.*

This case will submerge the Court in technical questions of policy[6] dependent, in turn, on underlying questions of developing science.[7]  They fall outside conventional judicial experience but squarely within the FDA's specialized expertise and authority.  21 U.S.C. §§ 393(b), 393(e), 371(a); *Ellis*, 443 F.3d at 82-83.  That agency is busy studying PFAS, directing resources where it perceives the greatest need. *See* Ex. 2.  FDA regulators are well aware that "[c]ertain PFAS"

---

[6] Should the potential risks of some, but not other, forms of PFAS in cosmetics, in what amounts, be deemed insignificant, acceptable, or unacceptable compared to background risks of environmental exposure?  What additional labeling, if any, beyond what the FDA already requires should the law mandate for cosmetics with those forms and quantities of PFAS as ingredients?  What if they are, or might be, present just as impurities or incidental ingredients?
[7] Can PFAS pose health risks if present in cosmetics?  If so, which forms of PFAS, in which types of cosmetics, raise risks of what health conditions?  Does PFAS in mascaras implicate any such risks, as opposed to eye shadows, eyeliners, lipsticks, foundations, blushes, concealers, nail polishes, hair dyes, or other cosmetics?  If so, what concentrations are necessary to pose risk?  How do these risks compare to background risks of environmental exposure to PFAS?

are "intentionally added as ingredients in some cosmetic products, including…mascara." Ex. 1 at 2.  They are likewise alert to chances that "[s]ome PFAS may also be present in cosmetics unintentionally" due to "raw material impurities" or ingredient "breakdown."  *Id.*  The FDA promises to monitor and collaborate in "research to fill data gaps" on whether and how PFAS might pose risks.  *Id.*  Meanwhile, policymakers are considering what additional regulation, if any, PFAS require.  *See Ellis*, 443 F.3d at 82-83.  Plaintiffs say the "federal government [is] mov[ing] to curtail" cosmetic PFAS.  FAC, ¶ 93.  The FDA has fielded bipartisan calls from Congress to "issue a proposed rule banning" intentional PFAS in cosmetics, with 2021 legislation pending to that effect.  *Id.* at ¶ 94.  It is also directing "Research, Testing & Analysis" of the food supply to plan its response "[a]s the science on PFAS advances."  Ex. 2 at 3-4.

This and other proliferating PFAS litigation may generate inconsistent rulings as the FDA does its work.[8]  *Ellis*, 443 F.3d at 88 ("Courts should be especially solicitous in deferring to agencies that are simultaneously contemplating the same issues.").  If this Court determines that potential risks of certain forms and quantities of PFAS in cosmetics merit special labeling, other courts or the FDA may differ.[9]  That would generate inconsistent obligations for nationwide businesses, such that the legally permissible labeling would vary across the states despite federal law's mandate of uniformity.  21 U.S.C. § 379s(a) (preempting cosmetic labeling requirements of state law); *see In Re KIND LLC "Healthy and All Natural" Litig.*, 209 F. Supp. 3d 689, 696 (S.D.N.Y. 2016); *Taradejna v. Gen. Mills, Inc.*, 909 F. Supp. 2d 1128, 1135 (D. Minn. 2012).

Scientific research and the resulting policymaking take time.  They are the domains of the

---

[8] *E.g., Onaka v. Shiseido Am. Corp.*, S.D.N.Y. no. 1:21-cv-10665-PAC; *Brown v. Coty, Inc.*, S.D.N.Y. no. 1:22-cv-2696-AT; *Solis v. Coty, Inc.*, S.D. Cal. no. 3:22-cv-400.

[9] Perhaps the opposition will complain that the FDA might take too long weigh in, but delay is not a proper consideration.  The "Supreme Court has consistently held that there are only two purposes to consider in determining whether to apply the primary jurisdiction doctrine -- uniformity and expertise," and it "has never identified judicial economy as a relevant factor."  *Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 fn. 2 (2d Cir. 2002).  In any event, Plaintiffs invited delay by framing an *avant-garde* liability theory that seeks to head off further development in PFAS research and policy, freezing both prematurely to suit a class action.

FDA, not courts.  Plaintiffs are unwilling to wait as the FDA monitors PFAS research to adjust policy on the contents and labeling of cosmetics.  So, they ask the Court to intercede, digest and resolve emerging science into a grainy snapshot at one early point in time, and then fashion cosmetic labeling policy to suit, using state law to make new standards for a nationwide business.  The Court should decline in deference to the FDA's primary jurisdiction.

## IV.    The Liability Theory Lacks A Plausible Foundation.

The FAC further requires dismissal in total because the liability theory animating each cause of action lacks a plausible basis in the objective expectations of the reasonable consumer. Whether sounding in purported misrepresentation or omission, each claim ultimately rests on the premise that Plaintiffs somehow expected mascaras with no chance of containing any detectable trace of PFAS impurities.  Yet, the FAC pleads no plausible basis for such an expectation.  There is no such representation in the cosmetics' labeling, which says nothing at all about PFAS. Further, the FAC itself establishes that expectation's implausibility, given Plaintiffs' allegations that PFAS exist practically everywhere that raw materials for consumer goods come from.

First, the law.  To prevail, Plaintiffs must establish that reasonable consumers were likely to be misled into expectations that the mascaras carried no possibility of containing a trace of any form of PFAS.  *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (consumer fraud plaintiffs "must establish that…allegedly deceptive advertisements were likely to mislead a reasonable consumer acting reasonably under the circumstances").  To state a claim, "plaintiffs must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers."  *Ostermeier-McLucas v. Rite Aid Hdqtrs. Corp*., 549 F. Supp. 3d 276, 282 (E.D.N.Y. 2021).  Rather, some widespread deception of consumers "must be probable, not just possible."  *Rite Aid*, 549 F. Supp. 3d at 283 ("significant portion of the general consuming public or of targeted consumers" must be deceived).  The "standard is an objective one."  *Id*.  As such, "[i]t is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer."  *Fink,* 714 F.3d at 741.

Thus, to plead the requisite likelihood of deception, Plaintiffs must set forth an objective

and plausible basis for their unmet expectations.  *Fink,* 714 F.3d at 741; *Rite Aid*, 549 F. Supp.

3d at 281-282.  "A plaintiff does not have a claim…just because she comes away from an

advertisement with an incorrect impression.  That impression must be reasonably traceable to a

misleading statement from the defendant."  *Harris v. Pfizer, Inc.*, ___ F. Supp. 3d ___, 2022 WL

488410, at *7 (S.D.N.Y. Feb. 16, 2022).  Where plaintiffs cannot so plead, all statutory and

common law claims resting on that theory of deception require dismissal.  *E.g., Barreto v.

Westbrae Natural, Inc.*, 518 F. Supp. 3d 795, 806 (S.D.N.Y. 2021) (dismissing range of statutory

and common law claims premised on same deficient theory of deception).

### A.    The FAC Does Not Plead A Plausible Basis For Plaintiffs' Expectation.

Here, Plaintiffs cannot tether their expectation that their mascaras had no chance of

containing a detectable quantum of PFAS to any such representation by L'Oréal.  There was

none.  The various labeling statements that the FAC challenges as purported misrepresentations

say nothing at all about PFAS.  FAC, ¶¶ 121-126.[10]  Much less do the challenged labeling

statements represent that no unit of the mascaras will possibly contain the slightest detectable

trace of any form of PFAS.  *Id.*  Rather, the statements characterize the mascaras' testing,

suitability, or general safety, not their chances of containing a trace of PFAS.  *Souter v. Edgewell

Personal Care Co.*, 542 F. Supp. 3d 1083, 1094-1095 (S.D. Cal. 2021) ("No reasonable

consumer would read 'hypoallergenic' and 'gentle' to mean [hand wipes product] is completely

free of ingredients that can cause an allergic reaction," particularly where those representations

concerned product's performance, not its ingredients).  Even then, the FAC does not assert, let

alone allege facts to plausibly plead, that the mascaras are unreasonably dangerous to use, or that

they aren't ophthalmologist and allergy tested, hypoallergenic, or suitable for sensitive eyes or

contact lens wearers.  Instead, its focus is merely the chance that some mascara units might

---

[10] "Ophthalmologist and allergy tested.  Suitable for sensitive eyes and contact lens wearers."
FAC, ¶ 122.  "Ophthalmologist and allergy tested.  Suitable for sensitive eyes.  Tested under
dermatological control for safety."  *Id*. at ¶ 124. "Ophthalmologist tested.  Suitable for contact
lenses."  *Id*. at 21-22, ¶ 125 (misquoting the labeling under challenge). "Ophthalmologist tested.
Contact lens safe."  *Id*. at 23.  "Contact lens safe.  Hypoallergenic."  *Id*. at ¶ 126.

contain a trace of PFAS, something the labeling says nothing about.

Plaintiffs fare no better if they intend to rely on the FDA-mandated ingredient lists as the basis of their expectation.  There are at least two reasons.  First, the ingredient lists do not represent that the products are PFAS-free.  Rather, they simply declare as an affirmative matter that the listed substances are present as ingredients.  Nowhere does the FAC allege a representation that the listed ingredients form 100% of the mascaras' detectable composition, to the exclusion of any and all impurities, trace molecules, or other substances whose disclosure the FDA does not require in an ingredient list.  *See Pfizer, Inc.*, ___ F. Supp. 3d  at ___, 2022 WL 488410, at *1, *4, *7 (complaint "fail[ed] to allege that Pfizer made any fraudulent statement" despite consumers' allegation that possibly carcinogenic contaminant was not "listed as an ingredient on the medication's box or labeling," since representation that drug's only active ingredient was varenicline did not support inference that product would not contain biologically active and allegedly carcinogenic N-nitroso-varenicline contaminant); *Hughes*, 818 F. Supp. 2d at 1121 (neither ingredient list nor "pharmacist-recommended" icon supported expectation that weight loss supplement would be free of hexavalent chromium or "perfect[ly] safe[]").

In any event, the original complaint already disavowed the ingredient list as a plausible source of consumer expectations about a chance trace of PFAS.  To burnish Plaintiffs' preempted theory that PFAS merit special labeling beyond FDA requirements, it asserted that "a reasonable consumer would be unlikely to identify" "most" PFAS examined in a consumer study even if the ingredient lists printed "the name of the ingredient."  Dkt. 1, ¶ 66.  So, even if the ingredient lists named PFAS using FDA naming conventions, consumers were "unlikely" to take notice or understand, meaning any such omission could not have injured them.  That concession concords with case law holding that an ingredient list's small print on the side or back of a product counts little or nothing in the consumer deception analysis.  *See Mantikas v. Kellogg Co.*, 910 F.3d 633, 639 (2d Cir. 2018) (derogating relevance of "small print on an ingredients list on the side of the package" to plausible consumer expectations); *Chong v. Kind LLC*, ___ F. Supp. 3d ___, 2022 WL 464149, at *4, fn. 1 (N.D. Cal. Feb. 12, 2022) (failure to print FDA-

mandated "% Daily Value" likely not a cognizable injury).

In short, nothing in the labeling they allegedly relied upon plausibly supports Plaintiffs'
expectation that their mascaras would be entirely free of any trace of a form of PFAS.  Courts
roundly reject similar attempts by consumer plaintiffs to contort representations about products
into saying things they simply don't.  In fact, there are several examples in similar cases
involving alleged contamination of consumable products.  Most recently, the D.C. Superior
Court turned down a consumer group's similar bid to portray as PFAS-related deception a
cosmetic firm's representations that it makes "sustainable," "clean," "responsible," and "good-
for-you makeup and skincare, prioritizing the health of our consumers and the planet."  *GMO
Free USA v. Cover Girl Cosmetics*, No. 2021 CA 004786 B (June 1, 2022), at p. 7, Ex. 5.  The
court's dismissal order reasoned that none of those statements could "plausibly be interpreted as
a representation that none of their products contains any PFAS chemical or any ingredient in a
large class that includes some chemicals which are unsafe or unsustainable."  *Id*.  So too here.

The Eighth and Tenth Circuits also recently affirmed dismissals when consumer plaintiffs
claimed that dog food contained traces of heavy metals, supposedly contradicting representations
that the dog food was "biologically appropriate."  *Song v. Champion Petfoods USA, Inc.,* 27
F.4th 1339, 1341 (8th Cir. 2022).  The phrase "biologically appropriate" could not plausibly
indicate "a complete absence of heavy metals like arsenic, cadmium, mercury, and lead."  *Id*. at
1344.  Reasonable consumers could not interpret "biologically appropriate" to support an
expectation that the manufacturer "eliminated all traces of heavy metals from the dog food."  *Id*.;
*Renfro*, 25 F.4th at 1306 ("No reasonable consumer would interpret" the phrase that way).

The pattern holds throughout cases alleging chemical impurities in products.  Courts do
not hesitate to dismiss where, as here, the deception theory lacks footing in the labeling.  *E.g*.,
*Parks v. Ainsworth Pet Nutrition, LLC*, 2020 WL 832863, at *1 (S.D.N.Y. Feb. 20, 2020)
("reasonable consumer[s] would not be so absolutist as to require that 'natural' means there is no
glyphosate, even an accidental and innocuous amount, in the products"); *Axon v. Citrus World,
Inc.*, 354 F. Supp. 3d 170, 184 (E.D.N.Y. 2018) (*affirmed* 813 Fed. Appx. 701 (2d Cir. 2020))

("Florida's Natural" and "100% Orange Juice" did not plausibly support expectation that juice would contain no trace of synthetic herbicide); *In Re Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *5-*6 (D. Minn. July 12, 2017) (dismissal with prejudice where label stating "Made with 100% Natural Whole Grain Oats" "did not represent or warrant that [granola bars] would be free from trace glyphosate"); *Yu v. Dr. Pepper Snapple Grp., Inc.*, 2020 WL 5910071, at *1, *7 (N.D. Cal. Oct. 6, 2020) ("All Natural Ingredients" did not plausibly represent applesauce and juice were "free of any trace pesticides whatsoever"); *Rugg v. Johnson & Johnson*, 2018 WL 3023493, at *3 (N.D. Cal. June 18, 2018) ("completely implausible" to take "hypoallergenic" "to mean that the product does not contain *any* ingredients, in any concentration, which could 'sensitize' the skin, cause cancer, or have *any* other negative effect") (emphasis original); *Souter,* 542 F. Supp. 3d at 1094-1095 (similar).[11]  This case similarly overtaxes the labeling.

### B.    Plaintiffs' Own Allegations Render Their Expectations Implausible.

The FAC does not just *fail* to plead a plausible, objective basis for Plaintiffs' case.  Its allegations spell out why Plaintiffs *cannot* plausibly plead an objective expectation that their mascaras had no chance of containing any detectable PFAS molecules.  Illogically, Plaintiffs expect PFAS practically everywhere, but not so much as a chance trace in their mascaras.

According to the FAC, today's reasonable consumers are "afraid of chemicals" and specifically "concerned about" PFAS.  FAC, ¶¶ 35, 71, 304.  It says consumers are "rightfully

---

[11] Outside the context of impurities, numerous other cases illustrate dismissal's necessity when the plaintiffs' expectations lack footing in labeling about product composition or safety.  This Court's judges roundly held that "vanilla" labeling is not a plausible basis to expect real vanilla. *E.g., Dashnau v. Unilver Mfrg. (US), Inc.*, 529 F. Supp. 3d 235, 245 (S.D.N.Y. 2021).  Other examples abound in an alleged safety context.  *E.g., Rice v. Sunbeam Prods., Inc.*, 2013 WL 146270, at *1, *5-6, (C.D. Cal. Jan. 7, 2013) (dismissing safety misrepresentation theory based on Crock-Pot exterior's capacity to burn users at 300⁰, despite marketing as "safe for household use," because statement said nothing about device's exterior temperature or corresponding danger, and "a plaintiff must allege a plausible interpretation of a representation that defendant actually made"); *Moreno v. Vi-Jon, LLC*, 2021 WL 5771229, at *5, *1 (S.D. Cal. Dec. 6, 2021) ("unassailable reality" that hand sanitizers "d[id] not represent that they will kill any of the serious pathogens listed by [complaint]," though label said product "kills 99.99% of germs*" and is "[e]ffective at eliminating more than 99.99% of many common harmful germs and bacteria").

concerned about the presence or risk of PFAS in various products." *Id*. at ¶ 62. The alleged "risks" of PFAS are already "widely known." *Id*. at ¶ 71; *id*. at ¶ 382 ("known since the 1950's"). Plaintiffs, who style themselves as typifying mascara consumers (*id*. at ¶ 327), regarded the potential presence of PFAS as "a material consideration" in their purchase decisions. *Id*. at ¶ 302. They are part of a "green" trend. *Id*. at ¶¶ 33-34.

At the same time, reasonable consumers also know that mascara, like every other consumer product, is made from raw materials that can only come from the environment. Yet, the FAC expounds Plaintiffs' view that PFAS pervade the environment. FAC, ¶ 44 ("highly persistent in the environment"); *id*. at ¶ 95 ("'forever chemicals'"); dkt. 1, ¶ 35 ("widely detected in environmental samples….across the globe"). It invokes a report declaring it a "given that PFAS are ubiquitous in the environment." Ex. 7 at 6. That includes most every source of nature's most common and abundant raw material, water. It would be, of course, nearly impossible to find a consumer product made without using water at some step in its manufacture. It is an ingredient itself in most foods and cosmetics. *E.g.,* FAC, ¶¶ 123-125 ("AGUA / WATER / EAU"). However, Plaintiffs say PFAS already contaminate "bodies of water" and "drinking water resources." *Id*. at ¶ 45; *id*. at ¶ 63 (no limit on PFAS in "the water supply"); dkt. 1, ¶ 33 (alleging PFAS in "groundwater, rivers, and the ocean, as well as drinking water resources"). Where else did Plaintiffs expect L'Oréal's water to come from? Animals are another classic source of raw materials for consumer products, including cosmetics. *E.g*., *id*. at ¶¶ 123-126 ("BEESWAX"); *id*. at 23, ¶ 125 ("COLLAGEN"). Plaintiffs assert that animals, too, are widely contaminated. *Id*. at ¶ 44 ("animal bodies"); *id*. at ¶ 45 ("fish," "marine mammals"); *id*. at ¶ 46 ("wildlife"). Basically, Plaintiffs already expect PFAS throughout nature's resources.

These allegations foreclose Plaintiffs' theory of consumer expectations. Their FAC posits, irreconcilably, that Plaintiffs understand "highly persistent" PFAS well enough to stay alert to even their potential presence in consumer products, but simultaneously expect no chance that a faint trace of some form of PFAS might find its way into products via raw materials from a natural environment they say is widely polluted with "forever" PFAS. That is implausible.

*Parks*, 2020 WL 832863, at *1 ("absolutist" to expect not even an "accidental" or "negligible" amount of glyphosate); *Song*, 27 F.4th at 1344 (affirming dismissal with prejudice because consumers could not plausibly expect dog food to be free of trace heavy metals since they exist in dog food's raw materials); *In Re Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *6 (dismissing theory of alleged glyphosate contamination in granola bars made with oats labeled "100% Natural" because "[i]t would be nearly impossible to produce a processed food with no trace of any synthetic molecule"); *Dr. Pepper*, 2020 WL 5910071, at *5, *7 (per "weight of authority in the federal courts," "not plausible as a matter of law" to expect applesauce "free of any trace pesticides whatsoever," even if labeled "All Natural Ingredients").

In sum, the FAC rests on Plaintiffs' certainty that there was no possibility of a chance trace of thousands of PFAS they say already suffuse the environment. They do not and cannot allege such a representation or any other plausible, objective basis for that expectation.

## V.      Even If It Were Plausible, Plaintiffs' Theory Remains Simply Unpled.

Setting aside its implausibility, the liability theory remains unpled under Rule 8(a) or the controlling Rule 9(b) because Plaintiffs do not plausibly allege that L'Oréal sold them mascaras containing any PFAS impurities, much less concentrations of a risky form of PFAS likely to cause them disease. *See* part I. A., *supra*. The supposedly liable act underlying each claim is simply unpled. Moreover, Plaintiffs venture a theory of chemical fraud, but fail to allege what offending chemicals their own purchases supposedly contained, gesturing instead to an entire grouping of "thousands of unique" substances. FAC, ¶ 44. As such, the FAC does not allege the "circumstances constituting fraud" against any Plaintiff, even though the entire case sounds in the same course of alleged fraud. FED. R. CIV. PROC. 9(b).

## IN CONCLUSION

This second attempt to plead is no better than the first. The FAC attempts to build a preempted, implausible, and unpled liability theory upon layers of non-justiciable speculation. The Court should let policymakers do their jobs as the PFAS science develops, dismiss this case, and do so with prejudice if it reaches the Rule 12(b)(6) defects.

Dated:  October 7, 2022

Respectfully submitted,

_s/ Justin D. Lewis_

Miles D. Scully*
mscully@grsm.com
Justin D. Lewis
jlewis@grsm.com
**GORDON REES SCULLY
MANSUKHANI, LLP**
101 W. Broadway, suite 2000
San Diego, California  92101
Tel.:  619-696-6700
Fax:  619-696-7124

Peter G. Siachos
psiachos@grsm.com
JoAnna M. Doherty
jmdoherty@grsm.com
**GORDON REES SCULLY
MANSUKHANI, LLP**
18 Columbia Turnpike, suite 220
Florham Park, New Jersey  07932
Tel.:  973-549-2500
Fax:  973-377-1911

Attorneys for defendant
L'ORÉAL USA, INC.

* _pro hac vice_ app. forthcoming