UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
                                                                  :
ZAIDA HICKS, STEPHANIE VARGAS, SUMNER                             :
DAVENPORT, STEPHANIE PINGHERA, KARRIE                             :
RUGGIERO, MARJIE SANTIAGO, KATHLEEN                               :
SECOR, GWENDOLYN SIMMONS, NANCY SPRING,                           :
HEIDI TREMBLY, LISA TURNER, and REBECCA                           :
VEGA, Individually and on Behalf of All Others                    :          22 Civ. 1989 (JPC)
Similarly Situated,                                               :
                                                                  :
                         Plaintiffs,                              :
                                                                  :
              -v-                                                 :
                                                                  :
                                                                  :
L'ORÉAL U.S.A., INC.,                                             :
                                                                  :
                         Defendant.                               :
                                                                  :
------------------------------------------------------------------X
                                                                  :
SONIA CAUCHI and STEPHANIE BRANTON,                               :
Individually and on Behalf of All Others Similarly                :
Situated,                                                         :
                                                                  :
                         Plaintiffs,                              :          22 Civ. 3926 (JPC)
                                                                  :
              -v-                                                 :          OPINION AND ORDER
                                                                  :
                                                                  :
L'ORÉAL U.S.A., INC.,                                             :
                                                                  :
                         Defendant.                               :
                                                                  :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

   Zaida Hicks, along with thirteen other Plaintiffs, brings this putative class action alleging

that Defendant L'Oréal U.S.A., Inc. violated a host of state consumer protection laws by failing to

disclose that several of its waterproof mascara products contain Per- and Polyfluoroalkyl

Substances ("PFAS").  Plaintiffs also bring several common law causes of action related to the same.  Before the Court is L'Oréal's motion to dismiss Plaintiffs' Amended Complaint.  Dkt. 29. Because the named Plaintiffs have failed to meet their "burden of demonstrating that they have standing," the Court grants L'Oréal's motion and dismisses the Amended Complaint without prejudice.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021).

## I.  Background

### A.    Facts[1]

L'Oréal is one of the world's largest cosmetics companies.  Am. Compl. ¶¶ 19, 104.  It is headquartered in New York City and owns and operates over thirty different brands.  *Id.* ¶ 104. L'Oréal sells ten different types of waterproof mascara through its "L'Oréal Paris" makeup line, and additional waterproof mascara products through the Maybelline brand.  *Id.* ¶ 110.  Plaintiffs allege that from at least 2018 to the filing of their Amended Complaint, L'Oréal engaged in "misleading[] and deceptive[] advertis[ing]" by representing that the company's waterproof mascaras "were safe, effective, high quality, and appropriate for use on consumers' eyelashes and around their eyes," when many of these products in fact contained "detectable amounts" of "harmful PFAS."  *Id.* ¶¶ 20-21, 23.  For instance, Plaintiffs point to product packaging for L'Oréal's Voluminous Waterproof Mascara, which states that the product is "ophthalmologist and allergy tested.  Suitable for sensitive eyes and contact lens wearers."  *Id.* ¶ 122.  The company's

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint, Dkt. 25 ("Am. Compl."), as well as documents incorporated by reference in the Amended Complaint.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . ." (internal quotation marks omitted)).

Voluminous Lash Paradise Waterproof Mascara similarly states that it is "ophthalmologist and allergy tested.  Suitable for sensitive eyes.  Tested under dermatological control for safety."  *Id.* ¶ 124.  Maybelline Volum' Express the Falsies Waterproof Mascara, Maybelline the Colossal Waterproof Mascara, and Maybelline Great Lash Waterproof Mascara all come in product packaging that contains substantially similar statements. *Id.* ¶¶ 125-126.

### 1.  PFAS

According to the Amended Complaint, "PFAS are human-made, synthetic chemicals that do not exist naturally in the environment" and have been used in a wide variety of consumer products, including cosmetics.  *Id.* ¶¶ 42-43, 72.  There are many unique varieties of PFAS in existence.  *Id.* ¶ 44.  They can be divided into long- and short-chain categories, depending on whether they contain seven or more carbon atoms.  *Id.* ¶ 46.  Despite these differences, "what all PFAS share is that they contain multiple carbon-fluorine bonds, considered one of the strongest in chemistry, making them highly persistent in the environment and in human and animal bodies." *Id.* ¶ 44.  Plaintiffs claim that this persistent quality "in the human body gives all PFAS a shared toxicity."  *Id.*  Indeed, Plaintiffs assert that long- and short-chain PFAS pose similar health and safety risks.  *Id.* ¶ 51.  More generally, they assert that PFAS "are toxic to humans at extremely low levels," claiming that "PFAS is associated in the medical and scientific literature with harmful and serious health effects in humans and animals," including risks of cancer, pregnancy-induced hypertension, and thyroid disease, among others.  *Id.* ¶ 55.

Plaintiffs point to a number of international and domestic efforts to curtail the use of various types of PFAS, including the U.S. Government's 2021 "PFAS Strategic Roadmap" initiative, "an interagency plan to combat the continued use and release of PFAS."  *Id.* ¶¶ 47-49. In June 2022, the U.S. Environmental Protection Agency ("EPA") announced "lifetime health

advisory levels" for several types of PFAS, including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS").  *Id.* ¶ 64.  Plaintiffs allege that the EPA set the advisory levels for these two PFAS at "below the detection capability of most measurement devices," and thus infer that the "EPA considers any detection of PFOA or PFOS to exceed the lifetime health advisory level."  *Id.* ¶ 64.

### 2.     PFAS in Cosmetics: The Notre Dame Study and Plaintiffs' Third-Party Testing of L'Oréal Products

PFAS are used in cosmetics in a variety of ways, including—as relevant to the waterproof mascaras at issue—to make products "more water-resistant, durable, and spreadable."  *Id.* ¶ 72. While certain PFAS may be identified on a cosmetic product's label or in its ingredient list, there are no formal federal regulations governing what cosmetic labels must disclose.  *Id.* ¶¶ 73, 77.

In 2021, a peer-reviewed analysis published by researchers at the University of Notre Dame (the "Notre Dame Study") screened 231 cosmetic products—to include lip products, eye products, foundations, face products, mascaras, concealers, and eyebrow products—for their total fluorine levels.  *Id.* ¶ 81.  The Notre Dame Study screened for fluorine levels because, Plaintiffs explain, "all PFAS are comprised of carbon-fluorine bonds" and therefore "analyzing a product for total fluorine is an accepted methodology to investigate whether PFAS are present."  *Id.* ¶ 82.  The Notre Dame Study found that while foundations had the highest median total fluorine concentration, several mascaras produced the highest fluorine concentrations and mascaras in general were among the three product categories with the highest proportion of fluorine concentrations, along with foundations and lip products.  *Id.* ¶ 83.  "Researchers found high fluorine levels in products commonly advertised as 'wear-resistant' to water and oils or 'long-lasting,' including foundations, liquid lipsticks, and waterproof mascaras."  *Id.* ¶ 84.

The Notre Dame Study entailed further analysis of twenty-nine different foundations, mascaras, and lip products, which revealed short-chain PFAS to be "most commonly detected in these products" and with all twenty-nine containing long-chain PFAS.  *Id.* ¶¶ 85, 88.  The Amended Complaint does not indicate how the researchers identified these twenty-nine products for further study.  Eight percent of the 231 total screened products listed some type of PFAS as an ingredient, and only one of the twenty-nine products listed PFAS as an ingredient.  *Id.* ¶ 88. Plaintiffs more generally attribute omissions of PFAS disclosures in cosmetic products' labels to a lack of "formal federal regulations governing what cosmetic labels must disclose," and note that members of Congress have introduced legislation "to curtail the widespread inclusion of PFAS in cosmetics products."  *Id.* ¶¶ 77, 93-94.

Notably, however, Plaintiffs do not allege that the Notre Dame Study included any L'Oréal waterproof mascara products.  *See id.* ¶ 81 ("Researchers analyzed lip products, eye products, foundations, face products, mascaras, concealers, and eyebrow products purchased from retailers such as Ulta Beauty, Sephora, Target, and Bed Bath & Beyond.").  But Plaintiffs—having reviewed the results of the Notre Dame Study—"sought independent third-party testing to determine whether certain L'Or[é]al cosmetic products contained PFAS" ("Plaintiffs' Third-Party Study").  *Id.* ¶ 96.  An "independent laboratory . . . utilized industry standard techniques to detect PFAS constituents in cosmetic products[,] . . . test[ing] for approximately 30 specific PFAS."  *Id.* ¶ 97.  Plaintiffs' Third-Party Study detected several varieties of PFAS in the following L'Oréal waterproof mascaras that were tested (collectively, the "Tested Products"):

- L'Oréal Voluminous Waterproof Mascara;

- Voluminous Lash Paradise™ Waterproof Mascara;

- Maybelline Volum' Express the Falsies Waterproof Mascara;

- Maybelline Volum' Express Total Temptation Waterproof Mascara;

- Maybelline Great Lash Waterproof Mascara; and

- Maybelline Total Temptation Waterproof Mascara.

*Id.* ¶¶ 98-99.  Plaintiffs further allege that the Tested Products "were shown to have PFAS levels beyond the EPA's lifetime health advisory level."  *Id.* ¶ 100.  However, Plaintiffs provide no information in the Amended Complaint concerning how many samples were tested in their Third-Party Study, whether all samples of a particular product tested positive for PFAS, from where these samples were sourced, the exact timing of their testing, the levels of PFAS found in each Tested Product, or which types of PFAS were found in each.

### 3.    Individual Plaintiffs

As noted above, Hicks brings this action along with thirteen other Plaintiffs.  The Amended Complaint alleges the following about each of them:

Hicks is a New York resident who has purchased L'Oréal Voluminous Waterproof Mascara, Maybelline Volum' Express the Falsies Waterproof Mascara, and Maybelline Great Lash Waterproof Mascara two to three times per year since 2019.[2]  *Id.* ¶¶ 4, 128, 134.  She has twice undergone eye surgery and has sensitive eyes.  *Id.* ¶ 130.

Stephanie Vargas is a New York resident who has purchased Maybelline Volum' Express the Falsies Waterproof Mascara once every four to five months for the past ten years.  *Id.* ¶¶ 5, 141.  She wears contact lenses.  *Id.* ¶ 143.

---

[2] The Court reminds Plaintiffs that "residence alone is insufficient to establish domicile for jurisdictional purposes," *Van Buskirk v. United Grp. Cos.*, 935 F.3d 49, 54 (2d Cir. 2019), and, therefore, "a statement of the parties' residence is insufficient to establish their citizenship" in a diversity jurisdiction case, *Leveraged Leasing Admin. Corp. v. PacifiCorp Cap., Inc.*, 87 F.3d 44, 47 (2d Cir. 1996).  Should Plaintiffs choose to amend the Amended Complaint and rely on diversity jurisdiction under 28 U.S.C. § 1332, they must allege the citizenship of each individual Plaintiff.

Sumner Davenport is a California resident who purchased L'Oréal Voluminous Waterproof Mascara on approximately seven occasions from 2017 to 2021. *Id.* ¶¶ 6, 156. She claims to have stopped using the product since she learned that it contains PFAS. *Id.* ¶ 159.

Stephanie Pinghera is a New York resident who purchased L'Oréal Voluminous Waterproof Mascara. *Id.* ¶¶ 7, 165, 168.[3] She used the product daily from January 1, 2020 to approximately November 1, 2021. *Id.* ¶ 168.

Karrie Ruggiero is a New Jersey resident who purchased L'Oréal Voluminous Waterproof Mascara. *Id.* ¶¶ 8, 177, 180. She used the product daily from some time before 2018 until roughly August 1, 2021. *Id.* ¶ 180.

Marjie Santiago is a New York resident who purchased L'Oréal Voluminous Waterproof Mascara. *Id.* ¶¶ 9, 189, 192. She used the product three times a week from some time prior to 2018 until roughly January 1, 2022. *Id.* ¶ 192.

Kathleen Secor is a New York resident who purchased L'Oréal Voluminous Lash Paradise Waterproof Mascara. *Id.* ¶¶ 10, 201, 204. She used the product daily from some time before 2018 until roughly October 1, 2021. *Id.* ¶ 204.

Gwendolyn Simmons is a Michigan resident who purchased L'Oréal Voluminous Waterproof Mascara. *Id.* ¶¶ 11, 213, 216. She used the product three times a week from roughly January 1, 2001 until approximately January 2022. *Id.* ¶ 216. Simons has stopped using the product since she learned that it contains PFAS. *Id.* ¶ 219.

---

[3] For several Plaintiffs, the Amended Complaint alleges the purchase of a specific product, followed by more general allegations referencing that Plaintiff's "purchase[]" of "Defendant's Products" or "the Products." *E.g.*, Am. Compl. ¶¶ 167-168 (Pinghera), 179-180 (Ruggiero), 191-192 (Santiago), 203-204 (Secor), 215-216 (Simmons), 227-228 (Spring), 239-240 (Trembly), 251-252 (Turner), 263-264 (Vega), 275 (Cauchi), 287 (Branton). It is unclear if the Amended Complaint is referring to the purchase of different items than the specific product or products identified for each Plaintiff.

Nancy Spring is a New York resident who purchased L'Oréal Voluminous Waterproof Mascara.  *Id.* ¶¶ 12, 225, 228.  She used the product approximately five times a week from roughly January 1, 2016 to November 1, 2021.  *Id.* ¶ 228.

Heidi Trembly is an Iowa resident who purchased L'Oréal Voluminous Waterproof Mascara.  *Id.* ¶¶ 13, 237, 240.  She used the product daily from some time before 2018 until approximately January 1, 2020.  *Id.* ¶ 240.  She stopped using the product before she learned that it contains PFAS.  *Id.* ¶ 243.

Lisa Turner is a North Carolina resident who purchased L'Oréal Voluminous Waterproof Mascara.  *Id.* ¶¶ 14, 249, 252.  She used the product three times a week from approximately January 1, 2016 to January 1, 2020.  *Id.* ¶ 252.  She stopped using the product after she learned that it contains PFAS.  *Id.* ¶ 255.

Rebecca Vega is a New Jersey resident who purchased L'Oréal Voluminous Waterproof Mascara.  *Id.* ¶¶ 15, 261, 264.  She used the product three times a week for at least one year starting approximately January 1, 2016.  *Id.* ¶ 264.  She stopped using the product after she learned that it contains PFAS.  *Id.* ¶ 267.

Sonia Cauchi is a New York resident who purchased Maybelline Great Lash Waterproof Mascara and L'Oréal Voluminous Waterproof Mascara.  *Id.* ¶¶ 16, 273.  She most recently purchased these two products in 2022.  *Id.* ¶ 276.  She stopped using the products after she learned that they contain PFAS.  *Id.* ¶ 279.

Stephanie Branton is a New York resident who purchased L'Oréal Voluminous Lash Paradise Waterproof Mascara and Maybelline Volum' Express the Falsies Waterproof Mascara.  *Id.* ¶¶ 17, 285.  She most recently purchased these products in 2022.  *Id.* ¶ 288.  She stopped using the products after she learned that they contain PFAS.  *Id.* ¶ 292.

Thus, Plaintiffs combined purchased L'Oréal products (the "Purchased Products") which were within the same line of products as the Tested Products.  Notably, each Plaintiff posits "on information and belief" that the products they purchased contained detectable levels of PFAS.  *Id.* ¶¶ 136, 147, 158, 170, 182, 194, 206, 218, 230, 242, 254, 266, 278, 291.  They claim that "[a]s a result of [L'Oréal's] negligent, reckless, and/or knowingly deceptive conduct, [they were] injured by purchasing, at a premium price, the Waterproof Mascara Products that were not of the quality and safety promised and that [they] would not have purchased if [they] had not been misled by [L'Oréal]."  *Id.* ¶¶ 139, 152, 163, 175, 187, 199, 211, 223, 235, 247, 259, 271, 283, 296.

Plaintiffs purport to bring this action on behalf of seven different classes, each composed of individuals who purchased products within the product line of the Tested Products: (1) all individuals in the United States who purchased the products from 2018 to present, (2) all individuals in New York who purchased the products from 2018 to present, (3) all individuals in California who purchased the products from 2018 to present, (4) all individuals in Iowa who purchased the products from 2018 to present, (5) all individuals in Michigan who purchased the products from 2016 to present, (6) all individuals in North Carolina who purchased the products from 2018 to present, and (7) all individuals in New Jersey who purchased the products from 2018 to present.  *Id.* ¶ 322.

Plaintiffs bring claims on behalf of themselves, the nationwide class, or alternatively the New York subclass for deceptive acts and practices under New York General Business Law section 349 (First Cause of Action) and false advertising under New York General Business Law section 350 (Second Cause of Action).  *Id.* ¶¶ 332-361.  They bring breach of express warranty (Third Cause of Action) and breach of implied warranty (Fourth Cause of Action) claims on behalf of themselves, the nationwide class, or alternatively the New York, California, Iowa, Michigan,

North Carolina, and New Jersey subclasses.  *Id.* ¶¶ 362-379.  They similarly bring fraudulent concealment (Fifth Cause of Action) and unjust enrichment (Sixth Cause of Action) claims on behalf of themselves, the nationwide class, or alternatively the New York, California, Iowa, Michigan, and New Jersey subclasses.  *Id.* ¶¶ 380-395.  Davenport brings claims on behalf of herself and the California subclass for violations of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* (Seventh Cause of Action), and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* (Eighth and Ninth Cause of Action).  Am. Compl. ¶¶ 396-420.  Trembly brings a claim under the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code §§ 714H.1 *et seq.*, on behalf of herself and the Iowa subclass (Tenth Cause of Action).  Am. Compl. ¶¶ 421-442.  Simmons brings a claim for violations of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901 *et seq.*, on behalf of herself and the Michigan subclass (Eleventh Cause of Action).  Am. Compl. ¶¶ 443-461.  Turner brings a claim for violations of the North Carolina Unfair and Deceptive Acts and Practices Act, N.C. Gen. Stat. §§ 75-1.1 *et seq.*, on behalf of herself and the North Carolina subclass (Twelfth Cause of Action). Am. Compl. ¶¶ 462-479.  Vega and Ruggiero bring a claim under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 *et seq.*, on behalf of themselves and the New Jersey subclass (Thirteenth Cause of Action).  Am. Compl. ¶¶ 480-494.

Plaintiffs seek declaratory relief, in addition to damages and monetary awards, for these alleged violations.  *Id.* at 73.[4]

---

[4] Plaintiffs clarified in their briefing that they "are no longer pursuing injunctive relief." Dkt. 33 ("Opposition") at 15 n.10.

## B.  Procedural History

With the exception of Cauchi and Branton, Plaintiffs filed the instant action on March 9, 2022.  Dkt. 1 (the "*Hicks* Action").  Cauchi and Branton then separately filed their action on May 13, 2022.  *See Cauchi v. L'Oréal USA, Inc.*, No. 22 Civ. 3926 (JPC) (S.D.N.Y.) (the "*Cauchi* Action"); *see also* Dkt. 22 at 1.  L'Oréal moved to dismiss the Complaint filed in the *Hicks* Action on June 24, 2022, Dkt. 16, but the Court—with the parties' consent—consolidated the *Hicks* Action and the *Cauchi* Action under Federal Rule of Civil Procedure 42(a)(2) on July 20, 2022, Dkt. 22.  The parties' stipulation, which was attached to the consolidation order, allowed Plaintiffs to file a consolidated amended complaint, Dkt. 22 at 2, and Plaintiffs accordingly filed the operative Amended Complaint on August 23, 2022, Dkt. 25.  The Court then denied L'Oréal's motion to dismiss the original Complaint in the *Hicks* Action as moot.  Dkt. 26.  L'Oréal moved to dismiss the Amended Complaint on October 7, 2022, seeking dismissal for lack of subject matter jurisdiction, pursuant to Federal Rule  of Civil Procedure 12(b)(1), and for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).  Dkt. 29.

## II.  Legal Standards

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  Courts take the uncontroverted facts of the complaint as true, but "[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration in original) (internal quotation marks omitted).

## III.  Discussion

### A.    Article III Standing

The Court begins—and ends—with L'Oréal's challenge to Plaintiffs' standing pursuant to Rule 12(b)(1), "because [standing] is a jurisdictional requirement and must be assessed before reaching the merits." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (internal quotation marks omitted).

Federal courts are of limited subject matter jurisdiction, as Article III of the U.S. Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion*, 141 S. Ct. at 2203 (quoting U.S. Const. art. III, § 2).  In turn, "[f]or there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Id.* (internal quotation marks omitted).  In the class action context, at least "one named plaintiff [must] have standing with respect to each claim."  *Hyland v. Navient Corp.*, 48 F.4th 110, 118 (2d Cir. 2022).  To satisfy the "irreducible constitutional minimum of standing," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks omitted), "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief," *TransUnion*, 141 S. Ct. at 2203.  Plaintiffs, as the collective party invoking federal jurisdiction, "bear the burden of demonstrating that they have standing." *Id.* at 2207.  "[A]t the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice."  *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  However, even with this relatively lenient pleading standing, plaintiffs still "must plead enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief." *Maddox*

*v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 65-66 (2d Cir. 2021) (internal quotation marks omitted).

L'Oréal advances four arguments for why Plaintiffs lack standing.  Three of them—which challenge whether the mascaras contained risky forms of PFAS, whether the mascaras contained harmful amounts of PFAS, and "the alleged links between some forms of PFAS and the risk of future health problems," Dkt. 30 ("Motion") at 11—are inappropriate for the Court to parse at this juncture.  *Id.* at 7-14.[5]  The Court accepts Plaintiffs' allegations as true at the pleadings stage, and,

---

[5] These arguments by L'Oréal appear to present a factual challenge to standing by proffering evidence, as opposed to a facial one based solely on the allegations in the Amended Complaint.  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).  "[W]here the jurisdictional challenge is fact-based, the defendant may 'proffer[] evidence beyond the [p]leading,' and the plaintiff 'will need to come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b) motion . . . reveal the existence of factual problems in the assertion of jurisdiction.'  *Maddy v. Life Time, Inc.*, No. 22 Civ. 5007 (LJL), 2023 WL 4364488, at *2 (S.D.N.Y. July 5, 2023) (quoting *Carter*, 822 F.3d at 57).

Even if the Court were to rely on the evidence presented by L'Oréal, however, they do not appear to contradict the Amended Complaint's plausible allegations.  *See Carter*, 822 F.3d at 57 ("However, the plaintiffs are entitled to rely on the allegations in the [p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing.").  L'Oréal first contends that the failure of the Amended Complaint to "plead what member(s) of the voluminous PFAS category Plaintiffs' units of mascara supposedly contained" undercuts the notion that Plaintiffs' individual mascaras contained harmful forms of PFAS, pointing to the fact that the Amended Complaint's own cited sources concluded that only some PFAS might be toxic.  Motion at 8.  But Plaintiffs base their allegations at least in part on their testing, which showed that several of the Products contained PFOA.  Am. Compl. ¶ 99.  And, in turn, the Amended Complaint also alleges that the EPA set lifetime health advisory levels for PFOA.  *Id.* ¶ 64.  The evidence L'Oréal points to therefore does not contradict the assertions about the types of PFAS plausibly contained in the Products.  L'Oréal's proffered evidence concerning toxic quantities of PFAS moves the needle no further.  *See* Motion at 8-11.  The FDA's and EPA's statements cited by Plaintiffs appear to show uncertainty about the level of PFAS that may be toxic; such an allegation does not contradict the notion that low levels of PFAS could plausibly be toxic at the pleadings stage.  The same logic applies to L'Oréal's argument about the uncertainties surrounding the links between PFAS and health problems: as L'Oréal notes, the Amended Complaint goes no further than the proffered FDA statements in noting this uncertainty.  *Id.* at 11-14.  It may well be that L'Oréal's claims could prove meritorious in later stages of litigation.  But in the absence of evidence that directly

relatedly, fact-specific inquiries are "generally inappropriate for resolution on a motion to dismiss." *Morningstar Films, LLC v. Nasso*, 554 F. Supp. 3d 525, 540-41 (E.D.N.Y. 2021). Here, Plaintiffs allege that "any amount of PFAS in products that may enter the body (such as through the eyes) is of concern and could potentially lead to adverse health effects." Am. Compl. ¶ 101. It may well be that L'Oréal's will be able to disprove this allegation through discovery, but their arguments to the contrary are premature at the motion to dismiss stage.

That leaves L'Oréal's argument that Plaintiffs have not established standing because they have not plausibly alleged that the mascaras they personally purchased—*i.e.*, the Purchased Products—contained PFAS. Motion at 4-6. The question here comes down to whether Plaintiffs have sufficiently pleaded that they have suffered an injury-in-fact. Such injury must be "real, and not abstract." *TransUnion*, 141 S. Ct. at 2204. Concrete injuries include "physical, monetary, or cognizable intangible harm[s] traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 2206.

Plaintiffs present a price-premium theory of injury. Broadly speaking, each Plaintiff alleges that she was injured from buying a Purchased Product "at a premium price," with each containing undisclosed, toxic PFAS. *E.g.*, Am. Compl. ¶¶ 139, 152, 163, 175, 187, 199, 211, 223, 235, 247, 259, 271, 283, 296. Plaintiffs contend that they would not have purchased those mascaras or would have paid less for them had they known that the products contained PFAS or— in the case of four of the named Plaintiffs—because of the "material risk" that the products contain PFAS, *id.* ¶¶ 138, 148, 279, 292. Such a price-premium theory of injury has been broadly accepted in the Second Circuit. *See, e.g., Axon v. Florida's Natural Growers, Inc.*, 813 F. App'x 701, 703-

---

contradicts material claims in the Amended Complaint, as opposed to generally sowing doubts about them, L'Oréal's factual challenge to standing is unavailing.

04 (2d Cir. 2020) ("[Plaintiff] has suffered an injury-in-fact because she purchased products bearing allegedly misleading labels and sustained financial injury—paying a premium—as a result."); *Onaka v. Shiseido Ams. Corp.*, No. 21 Civ. 10665 (PAC), 2023 WL 2663877, at *4 & n.3 (S.D.N.Y. Mar. 28, 2023) (collecting cases).  The problem, however, is that Plaintiffs have not alleged sufficient facts to allow the inference that the mascaras they individually purchased in fact contained PFAS, or that there was a material risk that they did.

Plaintiffs first rely on the June 2021 Notre Dame Study, which found the presence of PFAS in dozens of cosmetic products.  Am. Compl. ¶¶ 82, 85-87.  This study, based on the allegations in the Amended Complaint, does not get Plaintiffs very far.  Plaintiffs do not allege that any of the Tested Products were included in the Notre Dame Study.  In fact, Plaintiffs do not allege that any L'Oréal product whatsoever—whether mascara or other cosmetics, or whether through the "L'Oréal Paris" makeup line, the Maybelline brand, or otherwise—was part of the Notre Dame Study.

Further, with respect to the products tested in the Notre Dame Study, the Amended Complaint is murky as to the study's actual findings.  While the Notre Dame Study allegedly tested 231 cosmetic products for total fluorine, and found the highest proportion of fluorine in foundations, mascaras, and lip products, *id.* ¶¶ 81, 83, the Amended Complaint does not allege what proportion of those 231 products were found to have fluorine.  The Amended Complaint further alleges that "[s]everal mascaras gave the highest fluorine concentrations measured," *id.* ¶ 83, but does not indicate how many total mascara products were tested or what percentage of those mascaras contained fluorine.  With respect to the 231 products tested in the Notre Dame Study, the Amended Complaint discusses the presence of fluorine in at least some of those products, but does not expressly allege that fluorine was found in all of them.  Nor does the

Amended Complaint allege that the presence of fluorine necessarily means the presence of PFAS (or even that fluorine presence likely also means PFAS presence).  Plaintiffs allege that "all PFAS are comprised of carbon-fluorine bonds," *id.* ¶ 82, but that does not mean the converse is true: that the presence of carbon-fluorine bonds necessarily means the presence of PFAS.  And while Plaintiffs allege that the Notre Dame Study found that, of the twenty-nine products for which further analysis was performed, "short-chain PFAS were most commonly detected" and  all twenty-nine "contained long-chain PFAS," Plaintiffs do not allege how those twenty-nine products were selected for that additional testing.  *Id.* ¶¶ 86-87.  Were they randomly selected?  Were they the ones with the highest fluorine levels?  Nor does the Amended Complaint even allege how many of these twenty-nine products were mascaras.

Perhaps to address their obvious inability to rely on the findings of the Notre Dame Study to establish an injury linked to the Purchased Products, Plaintiffs arranged for another study, Plaintiffs' Third-Party Study, to measure PFAS in certain L'Oréal products.  *Id.* ¶¶ 96-98.  This "analysis tested for approximately 30 specific PFAS," and found PFAS to be present at levels "beyond the EPA's lifetime health advisory level" in the Tested Products.  *Id.* ¶¶ 97-100.  But there are also glaring shortcomings when relying on the findings of Plaintiffs' Third-Party Study to establish standing: the findings from that study, as alleged in the Amended Complaint, do not plausibly allege any injury with respect to the Purchased Products.  The Amended Complaint does not allege, for instance, how many products were tested in Plaintiffs' Study, whether all those tested products revealed the presence of PFAS, and if not, what percentage of the products had PFAS.

These allegations of injury are considerably weaker than those analyzed by the Second Circuit in *John v. Whole Foods*, where the Second Circuit reversed the district court's dismissal of

16

a putative class action for lack of standing.  The plaintiff in *John* alleged that Whole Foods violated New York law by overcharging customers for fourteen types of pre-packaged foods.  858 F.3d at 734-35.  Crucially for that case, a 2015 New York City Department of Consumer Affairs investigation revealed that eighty-nine percent of tested packages from Whole Foods were mislabeled.  *Id.*  The Second Circuit held that the widespread prevalence of overcharging revealed by the study, combined with the plaintiff's allegation that he "regularly purchased Whole Foods packages of cheese and cupcakes throughout the relevant period," sufficed at the pleadings stage to show an injury-in-fact.  *Id.* at 737-38.  The Circuit also held that the district court erred by attempting to "determine whether the [city government study's] sampling methods justified its declaration of widespread overcharging."  *Id.* at 737.  The Second Circuit explained that, "[a]t the pleading stage, [the plaintiff] need not prove the accuracy of the [study]'s findings or the rigor of its methodology; he need only generally allege facts that, accepted as true, make his alleged injury plausible."  *Id.*

In contrast, Plaintiffs in this case have provided no detailed allegations showing widespread prevalence of PFAS levels in the Purchased Products, on par with the allegations in *John*.  Again, Plaintiffs rely entirely on the Notre Dame Study and their Third-Party Study, but their allegations as to the meaningful results of each study with respect to the Purchased Products are exceedingly thin.  Of course, none of the actual Purchased Products were tested in either study, so neither features findings as to the products Plaintiffs actually purchased.  The Notre Dame Study is not even alleged to have tested any L'Oréal products, so the findings there are particularly unhelpful.  And although the Notre Dame Study tested unspecified cosmetics, including mascaras, the Amended Complaint fails to explain how the twenty-nine cosmetic products that were found to contain long-chain PFAS were chosen, how many of these twenty nine or the larger group of 231

17

products were waterproof mascaras as opposed to other cosmetic products, whether the study detected the same types of PFAS that were detected in the Tested Products, or how many of the 231 total products tested were found to have high fluorine levels, to list just a few uncertainties in the findings as alleged.  Such general allegations about the widespread use of PFAS in the cosmetics industry writ large cannot fill that gap and "nudge" their allegation that PFAS was in the Purchased Products "from conceivable to plausible."  *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 90 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

While Plaintiffs' Third-Party Study at least tested mascaras in the same product line as the Purchased Products, critical details are lacking as to that study's results as well.  Plaintiffs do not allege how pervasive PFAS was found to be in their Third-Party Study, such as whether PFAS was found in all the L'Oréal products tested or just a subset, or even whether all products within the same product line tested positive for the presence of PFAS.  In other words, although Plaintiffs have pleaded that their Third-Party Study found PFAS in certain products, no allegation establishes the prevalence of that presence.  The Amended Complaint also fails to allege when Plaintiffs' Third-Party Study occurred to allow an assessment of the proximity to Plaintiffs' purchases, although logically it must have take place at some point between the publication of the Notre Dame study in June 2021 and the filing of the original Complaint in March 2022.

The Amended Complaint's allegations boil down to describing general and unspecific results of testing, without meaningfully linking those results to Plaintiffs' actual Purchased Products beyond Plaintiffs' "information and belief."  *Cf. In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 678 (S.D.N.Y. 2018) ("[T]he Court need not credit 'mere conclusory

statements' in a complaint." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).[6]   In the

absence of further details, Plaintiffs have not plausibly pleaded that PFAS was present in the

Purchased Products in a "systematic and routine" way.   *John*, 858 F.3d at 737 (cleaned up).   The

Second Circuit's analysis in *John*—read in light of *Maddox*'s requirement that Plaintiffs "plead

enough facts to make [their injury] plausible"—thus militates toward concluding that the Amended

Complaint, in its current form, does not establish that Plaintiffs suffered an injury-in-fact.   This

conclusion also comports with other district judges who have recently applied *John* in similar

contexts.   *See Onaka*, 2023 WL 2663877, at *5 (reaching a similar conclusion when the plaintiffs

did not "plausibly allege[] that the presence of PFAS in the [relevant cosmetics products] is so

widespread as to render it plausible that any Plaintiff purchased a mislabeled Product at least once"

when "Plaintiffs provide[d] no facts from which the Court could extrapolate that their isolated

---

[6] Presumably relying on Plaintiffs' Third-Party Study, in conjunction with the Notre Dame Study, each Plaintiff asserts "on information and belief" that the mascaras they individually purchased "contained detectable levels of PFAS."  Am. Compl. ¶¶ 136, 147, 158, 170, 182, 194, 206, 218, 230, 242, 254, 266, 278, 291; *see* Opposition at 11 (maintaining that Plaintiffs have "show[n] systematic, ubiquitous contamination of the brand and type of products they purchased").  To be sure, the Court can as a general matter accept as true "facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).  That is not the case here.  While Plaintiffs allege a number of times in the Amended Complaint that L'Oréal had "exclusive knowledge of the contents and formula of [the Tested] Products, including whether they contained PFAS," Am. Compl. ¶ 311; *see also id.* ¶¶ 318, 436, 456, 473, the Amended Complaint also alleges that "PFAS occurs in cosmetic products both as an intended ingredient and as degradation products and impurities from the production of certain PFAS precursors used in certain products," *id.* at ¶ 79.  Plaintiffs claim that "a fair reading of the [Amended Complaint], with inferences drawn in [their] favor, suggests that PFAS are intentionally added by [L'Oréal] rather than a byproduct or impurity."  Opposition at 3-4.  That conclusion is not apparent to the Court.  Plaintiffs provide no citations to the Amended Complaint that could support such an inference, nor can the Court identify any.   The theory that PFAS were incidentally added to the products therefore is incorporated into the Amended Complaint's allegations, and, in turn, whether any of the individual Plaintiffs' mascaras contained PFAS is not "peculiarly within the possession and control of [L'Oréal]."   The Court therefore need not credit Plaintiffs' allegation of PFAS inclusion in their purchased products based only on their information and belief alone.

testing should apply broadly to Defendant's Products, regardless of when they were purchased");
*Wilson v. Mastercard, Inc.*, No. 21 Civ. 5930 (VEC), 2022 WL 3159305, at *5 (S.D.N.Y. Aug. 8,
2022) (concluding that a plaintiff's allegation that overcharging "occurred 'on a majority of days'"
did not suffice for a pervasive overcharging theory for foreign currency exchange transactions
when, among other issues, the plaintiff "neither allege[d] what those currencies are nor whether
she engaged in any transactions in those currencies").

It may be the case that another amended complaint, *see infra* III.B, can cure these
deficiencies with relative ease by pleading more details concerning Plaintiffs' Third-Party Study
to allege a linkage of the results to the Purchased Products.  Plaintiffs might be able to allege
testing results that show the presence of PFAS with such prevalence in the same product lines as
the Purchased Products that PFAS appears in "systematic[ally] and routine[ly]" in those products
for purposes of the *John* analysis.  *John*, 858 F.3d at 737 (cleaned up).  However they do it,
Plaintiffs must allege more details than they have in the Amended Complaint to support a
"systemic practices" theory.  They must plead sufficient facts "to make it plausible that [Plaintiffs]
did indeed suffer the sort of injury that would entitle them to relief."  *Maddox*, 19 F.4th at 65-66.
At the pleading stage, Plaintiffs are not required to "prove the accuracy of the[ir] findings or the
rigor of [their] methodology," with their allegations credited and all inferences related thereto
drawn in their favor.  *John*, 858 F.3d at 737.  But there must be a plausible basis to link their
findings to the Purchased Products.

The Court therefore concludes that, based on the Amended Complaint, Plaintiffs have not
adequately pleaded that the mascaras they purchased contained PFAS nor that there was a material
risk thereof.  The Court therefore finds that none of the named Plaintiffs have standing based on
the allegations in the Amended Complaint, and accordingly dismisses the Amended Complaint

without prejudice.  *See id.* at 735 ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice.").[7]

## B.      Leave to Amend

Lastly, the Court grants Plaintiffs' request for leave to amend.  *See* Opposition at 25.  Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Court will grant Plaintiffs leave to file a second amended complaint, in the event that they believe that they can plead facts that would adequately state a claim upon which relief may be granted and which can cure the standing-related defects identified above.  L'Oréal would not be unduly prejudiced by an amendment and is on notice as to the basic circumstances underlying the claims.  The Court emphasizes, however, that Plaintiffs should amend only if they are able to resolve the pleading deficiencies outlined in this Opinion and Order.

## IV.  Conclusion

For the foregoing reasons, the Court grants L'Oréal's motion to dismiss and dismisses the eleven causes of action without prejudice.  The Court also grants Plaintiffs' request for leave to

---

[7] There is also reason to be skeptical of standing for Trembly and Turner, even if Plaintiffs successfully address the aforementioned issues in a second amended complaint.  District courts interpreting *John* have noted that the Second Circuit's decision stands for the proposition that plaintiffs can link personal purchases of allegedly defective products that were made "reasonably near in time" to a study's similar finding thereof.  *See, e.g.*, *Onaka*, 2023 WL 2663877, at *4 (quoting *Clinger v. Edgewell Personal Care Brands, LLC*, No. 21 Civ. 1040 (JAM), 2023 WL 2477499, at *4 (D. Conn. Mar. 13, 2023)).  But Turner and Trembly stopped using the L'Oréal products a year and a half before the publication of the Notre Dame Study in June 2021, Am. Compl. ¶¶ 240, 252, and, as noted above, Plaintiffs' testing would have occurred sometime between the publication of the Notre Dame Study and the filing of their original Complaint in March 2022.  Depending on the exact timing of Plaintiffs' study, that gap between Turner and Trembly's use of the products and Plaintiffs' testing might undercut the link between their Purchased Products and the testing.

amend.   Should they choose to do so, Plaintiffs must file a second amended complaint by November 3, 2023.

The Clerk of Court is respectfully directed to close Docket Number 29.

SO ORDERED.

Dated: September 30, 2023
        New York, New York

_____
JOHN P. CRONAN
United States District Judge