UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                         :

ZAIDA HICKS, STEPHANIE VARGAS, SUMNER    :
DAVENPORT, STEPHANIE PINGHERA, KARRIE   :
RUGGIERO, MARJIE SANTIAGO, KATHLEEN    :
SECOR, GWENDOLYN SIMMONS, NANCY SPRING, :
HEIDI TREMBLY, LISA TURNER, and REBECCA  :
VEGA, Individually and on Behalf of All Others   :                 22 Civ. 1989 (JPC)
Similarly Situated,                                :

                          Plaintiffs,      :
                                    :

          -v-                           :

L'ORÉAL U.S.A., INC.,                    :

                       Defendant.     :
                                    :
------------------------------------------------------------------X
                                           :

SONIA CAUCHI and STEPHANIE BRANTON,    :
Individually and on Behalf of All Others Similarly  :
Situated,                                   :
                                    :

                          Plaintiffs,      :                 22 Civ. 3926 (JPC)
                                    :

          -v-                           :                 <u>OPINION AND ORDER</u>

L'ORÉAL U.S.A., INC.,                    :

                       Defendant.     :
                                    :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Fourteen Plaintiffs, residing in five different states, bring this putative class action alleging

that Defendant L'Oréal U.S.A., Inc. ("L'Oréal" or the "Company") failed to disclose that several

of its waterproof mascara products contained Per- and Polyfluoroalkyl Substances ("PFAS"), in

violation of a host of state consumer protection laws and common law.  Plaintiffs' claims are

premised on a price-premium theory of injury, as they insist that they would not have purchased

the mascaras, or paid the price they did, had they known that the products contained PFAS.  The

Court dismissed Plaintiffs' prior complaint on standing grounds, faulting them for failing to allege

facts that allowed for the plausible inference that PFAS were in the products they in fact purchased.

Plaintiffs then filed their Second Amended Complaint on December 4, 2023, adding allegations of

recent testing results of the mascara product lines at issue in this case.  L'Oréal has now moved to

dismiss the Second Amended Complaint, challenging the standing of all but one Plaintiff as well

as the merits of Plaintiffs' claims.  For reasons that follow, the Court grants in part and denies in

part L'Oréal's motion.

## I.  Background

### A.    Facts[1]

Headquartered in New York City, L'Oréal is one of the world's largest cosmetics

companies, owning and operating over thirty different brands.  SAC ¶¶ 19, 132.  L'Oréal sells ten

different types of waterproof mascara through its "L'Oréal Paris" makeup line and offers a number

of waterproof mascara products under its Maybelline brand as well.  *Id.* ¶ 138.  Plaintiffs allege

that from at least 2016 to December 4, 2023 (*i.e.*, the date they filed the Second Amended

Complaint), L'Oréal represented that its waterproof mascaras "were safe, effective, high quality,

and appropriate for use on consumers' eyelashes and around their eyes," when in fact many of

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from that Complaint, Dkt. 43 ("SAC"), as well as documents incorporated by reference in the Second Amended Complaint.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . ." (internal quotation marks omitted)).

these products in fact contained "detectable amounts" of "harmful PFAS." *Id.* ¶¶ 20-21; *see id.* ¶¶ 172-340 (alleging the dates individual Plaintiffs purchased and used the subject mascaras). For example, product packaging for L'Oréal Voluminous Lash Paradise Waterproof Mascara assured that the product was "ophthalmologist and allergy tested. Suitable for sensitive eyes. Tested under dermatological control for safety." *Id.* ¶ 154. The packaging for Maybelline Volum' Express the Falsies Waterproof Mascara and Maybelline Total Temptation Waterproof Mascara similarly stated that the products were "ophthalmologist tested. Suitable for contact wearers." *Id.* ¶ 155. Likewise, the packaging for Maybelline Great Lash Waterproof Mascara represented the product to be "contact lens safe" and "hypoallergenic." *Id.* ¶ 156.

### 1.    PFAS

As alleged in the Second Amended Complaint, "PFAS are human-made, synthetic chemicals that do not exist naturally in the environment" and have been used in a wide variety of consumer products, including cosmetics. *Id.* ¶¶ 53-54, 80. PFAS can be divided into long- and short-chain categories, depending on whether they contain seven or more carbon atoms. *Id.* ¶ 57. While there are many unique varieties of PFAS, "what all PFAS share is that they contain multiple carbon-fluorine bonds, considered one of the strongest in chemistry, making them highly persistent in the environment and in human and animal bodies." *Id.* ¶ 55. Plaintiffs claim that the ability of these chemicals to persist "in the human body gives all PFAS a shared toxicity." *Id.*

As alleged, "[h]umans may be exposed to PFAS through a variety of pathways, including ingestion, inhalation, and skin absorption." *Id.* ¶ 65. PFAS exposure, they claim, is "associated in the medical and scientific literature with harmful and serious health effects in humans." *Id.* ¶ 66. These health effects include, but are not limited to:

> (a) altered growth; (b) impacts to learning and behavior of infants and older children; (c) lowering a woman's chance of getting pregnant; (d) interference with

the body's natural hormones; (e) increased cholesterol levels; (f) modulation of the immune system; (g) testicular and kidney cancers; (h) thyroid disease; (i) high uric acid levels; (j) elevated liver enzymes; (k) ulcerative colitis; [] (l) pregnancy-induced hypertension; (m) increased allergic disease and sensitivity to allergens; (n) dermatitis; (o) eye disease; (p) dermal irritation; and (q) eye irritation.

*Id.*; *see also id.* ¶¶ 67-69 (alleging other possible health risks associated with exposure to PFAS).

In "June 2022, the [Environmental Protection Agency ('EPA')] announced a lifetime health advisory related to PFAS,"[2] setting "lifetime health advisory levels" for two types of PFAS, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"). *Id.* ¶ 72. For PFOA, the level was set at 0.004 parts per trillion ("ppt"), and for PFOS, the level was set at 0.02 ppt. *Id.* "These levels are below the detection capability of most measurement devices, meaning that [the] EPA considers any detection of PFOA or PFOS to exceed the lifetime health advisory level." *Id.* PFOA allegedly "is toxic in extremely small quantities" and "[t]he EPA has characterized PFOA as a 'likely carcinogen' and designated the chemical a 'hazardous substance' under the Comprehensive Environmental Response, Compensation, and Liability Act." *Id.* ¶ 25.

### 2. PFAS in Cosmetics and Testing of L'Oréal Products

As alleged, there are various explanations for how PFAS may end up in cosmetics. *Id.* ¶ 80. As most relevant here, Plaintiffs allege that PFAS may be intentionally added as an ingredient to cosmetic products to make them more water-resistant. *Id.*; *see id.* ¶ 90 ("When PFAS is present in a product describing itself as 'waterproof' or 'long-lasting,' it is likely [] an intentional ingredient, as PFAS provides hydrophobic, or 'water-resistant qualities.'"). In addition, PFAS "may be present as degradation products and impurities from the production of certain PFAS precursors used in certain products." *Id.* ¶ 87. "PFAS may also be present in cosmetic products

---

[2] "A health advisory is not a binding regulation but serves as informal technical guidance to assist government officials." SAC ¶ 72 (internal quotation marks omitted).

as a result of the manufacturing and/or transportation process" through a range of pathways. *Id.* ¶ 91. Given the many avenues by which PFAS might have ended up in the Company's cosmetic products, Plaintiffs allege that "L'Oréal knew or should have known that PFAS can be present in its cosmetic products as a result of degradation, the use of water or raw materials containing PFAS, or as a result of the manufacturing process of its cosmetics." *Id.* ¶ 93.

"Prior to 2021, no-peer reviewed research had been published analyzing whether PFAS were present in cosmetic products where the label did not disclose the presence of any such compounds." *Id.* ¶ 95. But in June 2021, researchers at Notre Dame published the results of a peer-reviewed study conducted on 231 cosmetic products (the "Notre Dame Study"). *Id.* ¶ 96. The study "screen[ed] for total fluorine" in the products tested, which is "an accepted methodology among researchers to investigate whether PFAS are present" as "all PFAS are comprised of carbon-fluorine bonds." *Id.* ¶¶ 96, 99. Included in "the 231 products analyzed were products, including mascara products, manufactured by [L'Oréal]." *Id.* ¶ 97. The "[r]esearchers did not identify which specific cosmetic products were tested, however, identifying only the manufacturer and product type." *Id.* The researchers sorted the results of the testing into three categories: products with high fluorine levels, defined as a concentration of greater than 0.384 μg F/cm$^2$; products with moderate fluorine levels, defined as a concentration between detection and 0.384 μg F/cm$^2$; and products with low fluorine, defined as containing a level less than or equal to the level of detection. *Id.* ¶ 98. Fifty-two percent of the 231 products tested contained high fluorine, sixteen percent contained moderate fluorine, and thirty-two percent contained low fluorine. *Id.* "Several mascaras gave the highest fluorine concentrations measured and 47% of the mascara products tested fell within the 'high fluorine' range,'" *id.* ¶ 100, though Plaintiffs do not specify which ones.

In addition, the "[r]esearchers found high fluorine levels in products commonly advertised as 'wear-resistant' to water." *Id.* ¶ 101.

The Notre Dame Study also entailed a "further analysis of 29 foundations, mascaras, and lip products." *Id.* ¶ 102. The researchers "did not explain precisely how these 29 products were selected for further analysis," although "they did state that twenty of the products selected were those with high fluorine detections" and thirteen "were mascara products." *Id.* This additional analysis revealed short-chain PFAS to be "most commonly detected in these products," though the researchers "also found that the 29 products contained long-chain PFAS." *Id.* ¶¶ 103-104. Eight percent of the 231 total screened products listed some type of PFAS as an ingredient, and only three percent of the twenty-nine products that underwent further testing listed some type of PFAS as an ingredient. *Id.* ¶ 106.

After reviewing the Notre Dame Study, Plaintiffs pursued "independent third-party testing to determine whether certain [L'Oréal] cosmetic products contained undisclosed PFAS." *Id.* ¶ 113. The first testing was conducted by an independent laboratory "in late 2021" (the "Late 2021 Testing"). *Id.* ¶ 114. This analysis "tested for approximately 30 specific PFAS." *Id.* The Late 2021 Testing examined one tube of each of the following five L'Oréal products: L'Oréal Voluminous Waterproof Mascara, L'Oréal Voluminous Lash Paradise Waterproof Mascara, Maybelline Volum' Express the Falsies Waterproof Mascara, Maybelline Great Lash Waterproof Mascara, and Maybelline Total Temptation Waterproof Mascara (collectively, the "Products"). *Id.* ¶¶ 116, 118. The lab analysis detected PFAS in each of the five tubes, showing the following:

- The L'Oréal Voluminous Waterproof Mascara tube contained 2.0 ng/g of perfluorododecanesulfonic acid.

- The L'Oréal Voluminous Lash Paradise Waterproof Mascara tube contained 390 ng/g of adsorbable organic fluorine.

- The Maybelline Volum' Express the Falsies Waterproof Mascara tube contained 0.22 ng/g of PFOA and 0.31 ng/g of perfluorohexanoic acid ("PFHxA").

- The Maybelline Great Lash Waterproof Mascara tube contained 1.1 ng/g of PFHxA.

- The Maybelline Total Temptation Waterproof Mascara tube contained 0.21 ng/g of PFOA.

*Id.* ¶ 118.

As discussed below, *see infra* I.B.2, on September 30, 2023, the Court dismissed without prejudice Plaintiffs' first Amended Complaint for lack of standing and granted Plaintiffs leave to amend. *See Hicks v. L'Oréal*, Nos. 22 Civ. 1989 (JPC), 22 Civ. 3926 (JPC), 2023 WL 6386847 (S.D.N.Y. Sept. 30, 2023). Shortly after that dismissal, in October 2023, Plaintiffs "performed a second round of testing" of additional tubes of the same five Products that were the subject of the Late 2021 Testing (the "October 2023 Testing"). SAC ¶ 119. For that supplemental testing, Plaintiffs purchased four to five tubes of each Product "from multiple major retail outlets in New York City." *Id.* The selected tubes were then sent for testing to "a qualified laboratory different from the laboratory they had used for the [Late 2021 Testing]." *Id.* ¶ 120. The results of the October 2023 Testing were as follows:

- Five L'Oréal Voluminous Waterproof Mascara tubes were tested, with PFAS detected in all of them. Of these tubes, "two contained PFOA concentrations exceeding 3.0 ppt and a third contained PFOA concentrations exceeding 4.0 ppt, meaning that Voluminous products contained PFOA up to 1,000 times greater than the EPA health advisory level." *Id.* ¶ 121.

- Four L'Oréal Voluminous Lash Paradise Waterproof Mascara tubes were tested, with PFAS detected in all four. "PFOA concentrations were detected in quantities of 2.57 ppt, 3.24 ppt, 1.62 ppt, and 1.81 ppt, meaning that Lash Paradise products ranged from 405 times the EPA health advisory level to 810 times the EPA health advisory level." *Id.*

- Five Maybelline Volum' Express the Falsies Waterproof Mascara tubes were tested, with PFAS detected in all five. They "contained PFOA concentrations ranging from 0.31 ppt to 1.26 ppt, meaning these products contained PFOA up to 315 times the EPA health advisory level." *Id.*

- Five Maybelline Great Lash Waterproof Mascara tubes were tested, with PFAS detected in all five. They "contained PFOA concentrations ranging from 0.28 ppt to 1.20 ppt, meaning these products contained PFOA up to 300 times the EPA health advisory level." *Id.*

- Five Maybelline Total Temptation Waterproof Mascara tubes were tested, with PFAS detected in all five. They "contained PFOA in concentrations of 2.04 ppt, 1.94 ppt, 1.69 ppt, 1.53 ppt, and 1.18 ppt, meaning these products contained PFOA over 500 times the EPA health advisory level." *Id.*[3]

At this same time, Plaintiff Zaida Hicks also provided for testing "3 partially used Waterproof Mascara Products" that she had purchased for "personal use in 2021 before learning that [L'Oréal] waterproof mascara products likely contained PFAS." *Id.* ¶ 125. This testing revealed that Hick's two Maybelline Great Lash Waterproof Mascara tubes contained PFOA in concentrations of 1.29

---

[3] "Many of the 24 products tested also contained other PFAS in addition to PFOA. For instance, [L'Oréal] Voluminous, [L'Oréal] Lash Paradise, and Maybelline Total Temptation contained PFHxA above the detection limit." SAC ¶ 122.

ppt and 1.11 ppt and PFHxA in concentrations of 0.18 ppt for each product, and that her L'Oréal

Voluminous Waterproof Mascara tube contained "PFOA at a concentration of 0.73 ppt and PFHxA

at a concentration of 0.14 ppt." *Id.* ¶ 126.

### 3.    Individual Plaintiffs

The Second Amended Complaint alleges the following about purchases of the Products

made by the fourteen Plaintiffs in this action.

Hicks, a New York resident, has purchased L'Oréal Voluminous Waterproof Mascara,

Maybelline Volum' Express the Falsies Waterproof Mascara, and Maybelline Great Lash

Waterproof Mascara since 2019, making at least two to three purchases per year. *Id.* ¶¶ 4, 172,

178.

Stephanie Vargas, also a New York resident, has purchased Maybelline Volum' Express

the Falsies Waterproof Mascara approximately once every four to five months for the past ten

years. *Id.* ¶¶ 5, 184.  Plaintiffs do not allege the location of Vargas's purchases.

Sumner Davenport, a California resident, purchased L'Oréal Voluminous Waterproof

Mascara on approximately seven occasions during the summer from 2017 to 2021. *Id.* ¶¶ 6, 197,

199.  Plaintiffs do not allege the location of Davenport's purchases.

Stephanie Pinghera, a New York resident, purchased L'Oréal Voluminous Waterproof

Mascara in Bronx County, New York. *Id.* ¶¶ 7, 208, 210.[4]  She began purchasing that Product on

---

[4] For several Plaintiffs, the Second Amended Complaint alleges the purchase of a specific product or two specific products, followed by more general allegations referencing that Plaintiff's "purchase[]" of "Defendant's Products" or "the Products." *E.g.*, SAC ¶¶ 208-211 (Pinghera), 220-223 (Ruggiero), 232-235 (Santiago), 244-247 (Secor), 256-259 (Simmons), 268-271 (Spring), 280-283 (Trembly), 292-295 (Turner), 304-307 (Vega), 316-318 (Cauchi), 328-330 (Branton). Although the Court noted this ambiguity in its prior Opinion dismissing the first Amended Complaint, *see Hicks*, 2023 WL 6386847, at *3 n.3, it was not clarified in the Second Amended Complaint.  The Court therefore understands Plaintiffs' pleading to allege that each Plaintiff purchased only the specific Product or Products she is alleged to have purchased.

or about January 1, 2020, and used it on about a daily basis until approximately November 1, 2021. *Id.* ¶ 211.

Karrie Ruggiero, a New Jersey resident, purchased L'Oréal Voluminous Waterproof Mascara in Cumberland County, New Jersey. *Id.* ¶¶ 8, 220, 222. She began purchasing that Product at some point before 2018 and used it on about a daily basis until at least August 1, 2021. *Id.* ¶ 223. Ruggiero stopped using the Product upon learning it contained PFAS. *Id.* ¶ 226.

Marjie Santiago, a New York resident, purchased L'Oréal Voluminous Waterproof Mascara in Queens County, New York. *Id.* ¶¶ 9, 232, 234. She began purchasing that Product prior to 2018 and used it about three times a week until at least January 1, 2022. *Id.* ¶ 235.

Kathleen Secor, a New York resident, purchased L'Oréal Voluminous Lash Paradise Waterproof Mascara in Monroe County, New York. *Id.* ¶¶ 10, 244, 246. She began purchasing that Product some time before 2018 and used it on about a daily basis until at least October 1, 2021. *Id.* ¶ 247.

Gwendolyn Simmons, a Michigan resident, purchased L'Oréal Voluminous Waterproof Mascara in Wayne County, Michigan. *Id.* ¶¶ 11, 256, 258. She began purchasing that Product on or about January 1, 2001, and used it about three times a week until at least January 2022. *Id.* ¶ 259.

Nancy Spring, a New York resident, purchased L'Oréal Voluminous Waterproof Mascara in Monroe County, New York. *Id.* ¶¶ 12, 268, 270. She began purchasing that Product on or about January 1, 2016, and used it about five times a week until at least November 1, 2021. *Id.* ¶ 271.

Heidi Trembly, an Iowa resident, purchased L'Oréal Voluminous Waterproof Mascara in Polk County, Iowa. *Id.* ¶¶ 13, 280, 282. She began purchasing that Product some time before

2018 and used it on about a daily basis until at least January 1, 2020.  *Id.* ¶ 283.  Trembly stopped using the Product prior to learning that it allegedly contained PFAS.  *Id.* ¶ 286.

Lisa Turner, a North Carolina resident, purchased L'Oréal Voluminous Waterproof Mascara in Carteret County, North Carolina.  *Id.* ¶¶ 14, 292, 294.  She began purchasing that Product on approximately January 1, 2016, and used it about three times a week until approximately January 1, 2020.  *Id.* ¶ 295.

Rebecca Vega, a New Jersey resident, purchased L'Oréal Voluminous Waterproof Mascara in Essex County, New Jersey.  *Id.* ¶¶ 15, 304, 306.  She began purchasing that Product on approximately January 1, 2016, and used it "about three times a week for over a year or more." *Id.* ¶ 307.

Sonia Cauchi, a New York resident, purchased Maybelline Great Lash Waterproof Mascara and L'Oréal Voluminous Waterproof Mascara.  *Id.* ¶¶ 16, 316.  She apparently made purchases of these two Products on unspecified dates in Queens, with her most recent purchase occurring in 2022 at a Target store in Queens.  *Id.* ¶¶ 318-319.

Stephanie Branton, a New York resident, purchased L'Oréal Voluminous Lash Paradise Waterproof Mascara and Maybelline Volum' Express the Falsies Waterproof Mascara.  *Id.* ¶¶ 17, 328.  She apparently made purchases of these two Products on unspecified dates in Nassau County, New York.  *Id.* ¶ 330.  Branton's most recent purchase occurred in 2022 from an online retailer, with the items shipped to her home in Nassau County.  *Id.* ¶¶ 331-332.

All Plaintiffs aside from Hicks posit "on information and belief" that the Products they purchased contained detectable levels of PFAS.  *Id.* ¶¶ 190, 201, 213, 225, 237, 249, 261, 273, 285, 297, 309, 321, 334.  Hicks, however, alleges that each of the mascaras she purchased "was found to contain PFOA and PFHxA, among other PFAS compounds, when tested by an

independent lab" during the October 2023 Testing discussed above.  *Id.* ¶ 173; *see supra* I.A.2.

All Plaintiffs claim that "[a]s a result of [L'Oréal]'s negligent, reckless, and/or knowingly

deceptive conduct, [they were] injured by purchasing, at a premium price, the Waterproof Mascara

Products that were not of the quality and safety promised and that [they] would not have purchased

[the Products] if [they] had not been misled by [L'Oréal]."  SAC ¶¶ 182, 195, 206, 218, 230, 242,

254, 266, 278, 290, 302, 314, 326, 339.

**B.    Procedural History**

    **1.    The Prior Complaints**

Twelve of the current Plaintiffs (all except Cauchi and Branton) commenced this action on

March 9, 2022, by filing the original Complaint.  Dkt. 1 (the "*Hicks* Action").  Cauchi and Branton

then separately filed an action on May 13, 2022.  *See Cauchi v. L'Oréal USA, Inc.*, No. 22 Civ.

3926 (JPC) (S.D.N.Y.) (the "*Cauchi* Action"); *see also* Dkt. 22 at 1.  L'Oréal moved to dismiss

the original Complaint in the *Hicks* Action on June 24, 2022, Dkt. 16, but the Court—with the

parties' consent—consolidated the *Hicks* Action and the *Cauchi* Action pursuant Federal Rule of

Civil Procedure 42(a)(2) on July 20, 2022, Dkt. 22.  The parties' stipulation, which was attached

to the consolidation order, allowed Plaintiffs to file a consolidated amended complaint, Dkt. 22 at

2, and Plaintiffs accordingly filed their first Amended Complaint on August 23, 2022, Dkt. 25.

The Court then denied L'Oréal's motion to dismiss the original Complaint in the *Hicks* Action as

moot.  Dkt. 26.  The Amended Complaint was brought on behalf of seven different classes of

individuals who purportedly purchased the Products and asserted claims under New York,

California, Iowa, Michigan, North Carolina, and New Jersey law.[5]  *See* Dkt. 25 ¶¶ 321, 332-361, 396-494.

### 2.     The September 30, 2023 Opinion

L'Oréal moved to dismiss the Amended Complaint on October 7, 2022, seeking dismissal for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6).  Dkts. 29-32.  On September 30, 2023, the Court granted L'Oréal's motion, holding that Plaintiffs lacked standing to pursue their claims because they failed to plausibly allege that the mascaras they personally purchased contains PFAS and, therefore, failed to plead an injury-in-fact.  *Hicks*, 2023 WL 6386847, at *7-9.

In arriving at this result, the Court determined that the Notre Dame Study failed to establish Plaintiffs' standing, explaining that the Amended Complaint did not even allege that any of the Products at issue were in fact included in that study and further observing that the study's findings, as described in the Amended Complaint, were "murky."  *Id.* at *7.  The Court also found "glaring shortcomings" in the allegations concerning the Late 2021 Testing—which was not referred to as the "Late 2021 Testing" in that Opinion because its date was not alleged in the Amended Complaint.  *Id.* at *8.  The Court explained that "[t]he Amended Complaint d[id] not allege, for instance, how many products were tested in [the Late 2021 Testing], whether all those tested products revealed the presence of PFAS, and if not, what percentage of the products had PFAS."  *Id.*  Thus, the Court observed, the allegations in the Amended Complaint were "considerably weaker than those analyzed by the Second Circuit in *John v. Whole Foods*, where the Second Circuit reversed the district court's dismissal of a putative class action for lack of standing."  *Id.*

---

[5] The Second Amended Complaint is brought on behalf of the same Plaintiffs, asserting the same claims, as the Amended Complaint.  *See infra* I.B.3.

(citing *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732 (2d Cir. 2017)).  This led the Court to conclude that Plaintiffs failed to provide "detailed allegations showing widespread prevalence of PFAS levels in the Purchased Products," *id.*, and "that the Amended Complaint . . . d[id] not establish that Plaintiffs suffered an injury-in-fact," *id.* at *9.  The Court also granted Plaintiffs leave to amend the Amended Complaint in the event that they believed that they could cure these pleading deficiencies as to standing and adequately state a claim.  *Id.* at *10.

### 3.    The Second Amended Complaint

Having been granted that leave, Plaintiffs filed the operative Second Amended Complaint on December 4, 2023.  Dkt. 43.  Plaintiffs purport to bring claims on behalf of seven different classes, each composed of individuals who made purchases within the product line of the Products. Those proposed classes are: (1) all individuals in the United States who purchased the Products from 2018 to present, (2) all individuals in New York who purchased the Products from 2018 to present, (3) all individuals in California who purchased the Products from 2018 to present, (4) all individuals in Iowa who purchased the Products from 2018 to present, (5) all individuals in Michigan who purchased the Products from 2016 to present, (6) all individuals in North Carolina who purchased the Products from 2018 to present, and (7) all individuals in New Jersey who purchased the Products from 2018 to present.  SAC ¶ 366.

The Second Amended Complaint pleads thirteen causes of action.  Plaintiffs bring claims on behalf of themselves and the nationwide class, or in the alternative the New York subclass, for deceptive acts and practices under New York General Business Law Section 349 ("First Cause of Action") and false advertising under New York General Business Law Section 350 ("Second Cause of Action").  *Id.* ¶¶ 376-405.  They bring breach of express warranty ("Third Cause of Action") and breach of implied warranty ("Fourth Cause of Action") claims on behalf of

themselves and the nationwide class, or in alternative the New York, California, Iowa, Michigan, North Carolina, and New Jersey subclasses. *Id.* ¶¶ 406-423. They similarly bring claims for fraudulent concealment ("Fifth Cause of Action") and unjust enrichment ("Sixth Cause of Action") on behalf of themselves and the nationwide class, or in the alternative the New York, California, Iowa, Michigan, and New Jersey subclasses. *Id.* ¶¶ 424-439. Davenport brings claims on behalf of herself and the California subclass for violations of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("Seventh Cause of Action") and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("Eighth Cause of Action" and "Ninth Cause of Action"). SAC ¶¶ 440-464. Trembly brings a claim under the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code §§ 714H.1 *et seq.*, on behalf of herself and the Iowa subclass ("Tenth Cause of Action"). SAC ¶¶ 465-486. Simmons brings a claim under the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901 *et seq.*, on behalf of herself and the Michigan subclass ("Eleventh Cause of Action"). SAC ¶¶ 487-505. Turner brings a claim under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1 *et seq.*, on behalf of herself and the North Carolina subclass ("Twelfth Cause of Action"). SAC ¶¶ 506-523. Vega and Ruggiero bring a claim under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 *et seq.*, on behalf of themselves and the New Jersey subclass ("Thirteenth Cause of Action"). SAC ¶¶ 524-538. Plaintiffs seek monetary awards for these alleged violations. *Id.* at 82-83.[6]

---

[6] Throughout the Second Amended Complaint, Plaintiffs requests injunctive relief. *See, e.g.*, SAC ¶¶ 375, 390, 405, 448, 537, 538, p. 82. In opposing dismissal, Plaintiffs clarify that they "do not seek injunctive or other prospective relief" and their requests for injunctive relief "remained a part of the operative pleading as an oversight." Dkt. 52 ("Opposition") at 9 n.6. Plaintiffs' requests for injunctive relief in the Second Amended Complaint are thus denied without prejudice.

### 4. The Pending Motion to Dismiss

On January 26, 2024, L'Oréal moved to dismiss the Second Amended Complaint for lack of subject matter jurisdiction and for failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6), respectively. Dkts. 49, 50 ("Motion"), 51. On February 27, 2024, Plaintiffs opposed L'Oréal's motion. Dkt. 52. On March 15, 2024, L'Oréal filed its reply. Dkt. 55 ("Reply"). On April 23, 2024, L'Oréal filed a letter regarding supplemental authority. Dkt. 58.

## II. Legal Standards

### A. Federal Rule of Civil Procedure 12(b)(1)

L'Oréal moves to dismiss the claims of all Plaintiffs aside from Hicks for lack of standing, and thus lack of subject matter jurisdiction, under Federal Rule of Civil Procedure 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Challenges to the Court's subject matter jurisdiction under Rule 12(b)(1) come in two forms: facial or factual. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). Where, as here, the defendant raises a facial challenge to standing, *i.e.*, one "based solely on the allegations of the complaint or the complaint and exhibits attached to it," the Court's task "is to determine whether the [p]leading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (internal quotation marks omitted) (alterations in original omitted). The plaintiff bears no evidentiary burden in refuting such a challenge. *Id.* In contrast, "[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration in original) (internal quotation marks omitted).

16

**B.      Federal Rule of Civil Procedure 12(b)(6)**

L'Oréal alternatively moves to dismiss all of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* These "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

**III.  Discussion**

**A.      Article III Standing**

The Court begins with L'Oréal's challenge to Plaintiffs' standing pursuant to Rule 12(b)(1) "because [standing] is a jurisdictional requirement and must be assessed before reaching the merits." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (internal quotation marks omitted).  As discussed above, *see supra* I.B.2, Plaintiffs' failure to adequately plead standing in the Amended Complaint led to the dismissal without prejudice of that pleading. *Hicks*, 2023 WL 6386847, at *7-9.  L'Oréal acknowledges that Hicks now has sufficiently pleaded standing in the Second Amended Complaint based on the alleged results of the October 2023 Testing of three mascara tubes that she actually purchased. *See* Motion at 3. But for all the other Plaintiffs, L'Oréal argues that standing remains lacking because those "Plaintiffs still do not

plausibly allege that their units of mascara contained a single molecule of any form of PFAS." *Id.* at 3. That is because, according to L'Oréal, "the sample products Plaintiffs tested are too disconnected by time and place from Plaintiffs' own . . . purchase[] histories." *Id.* Plaintiffs respond by arguing that the combination of the Notre Dame Study, the Late 2021 Testing, and the October 2023 Testing demonstrates "the pervasive presence of PFAS in the Products" and therefore meets the injury-in-fact requirement to support standing for all Plaintiffs. Opposition at 8; *accord id.* at 6-9.[7]

Article III of the U.S. Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Id.* (internal quotation marks omitted). In the class action context, at least "one named plaintiff [must] have standing with respect to each claim." *Hyland v. Navient Corp.*, 48 F.4th 110, 118 (2d Cir. 2022) (internal quotation marks omitted). To satisfy the "irreducible constitutional minimum of standing," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks omitted), "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would

---

[7] Plaintiffs additionally argue that Cauchi has standing because testing revealed the presence of PFAS in a Product she actually purchased. Opposition at 6. There is no mention of such testing in the Second Amended Complaint, however. *See generally* SAC. Rather, Plaintiffs point to their counsel's mention of that supposed testing in a correspondence with the Court. Opposition at 6 (citing Dkt. 45). As noted above, L'Oréal brings a facial challenge to subject matter jurisdiction, relying on only the allegations of the Second Amended Complaint. In considering such a facial challenge, the Court is constrained to the pleadings. *Cf. Carter*, 822 F.3d at 57 ("Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading." (citation omitted)). The Court therefore rejects Plaintiffs' attempt to rely on information not pleaded in the Second Amended Complaint to establish Cauchi's standing.

likely be redressed by judicial relief," *TransUnion*, 594 U.S. at 423.  Plaintiffs, as the collective

party invoking federal jurisdiction, "bear the burden of demonstrating that they have standing."

*Id.* at 430-31.  "[A]t the pleading stage, 'general factual allegations of injury resulting from the

defendant's conduct may suffice.'"  *John*, 858 F.3d at 736 (quoting *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 561 (1992)).  Notwithstanding this relatively lenient pleading standard, Plaintiffs still

"must plead enough facts to make it plausible that they did indeed suffer the sort of injury that

would entitle them to relief."  *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 65-66

(2d Cir. 2021) (internal quotation marks omitted).

Plaintiffs rely on a price-premium theory of injury.  *See, e.g.*, SAC ¶¶ 182, 195, 206, 218,

230, 242, 254, 266, 278, 290, 302, 314, 326, 339.  In other words, Plaintiffs insist that they would

not have purchased the Products, or would not have paid as much for them, had they known the

mascaras contained PFAS.  *See, e.g.*, *id.* ¶ 34 ("Had Plaintiffs known these products contained

PFAS, including PFOA, they would have paid less for the products or purchased a different, non-

toxic product altogether.").[8]  This theory of injury "has been broadly accepted in the Second

Circuit."  *Hicks*, 2023 WL 6386847, at *7 (citing *Axon v. Fla.'s Nat. Growers, Inc.*, 813 F. App'x

701, 703-04 (2d Cir. 2020); *Onaka v. Shiseido Ams. Corp.* ("*Onaka I*"), No. 21 Civ. 10665 (PAC),

2023 WL 2663877, at *4 & n.3 (S.D.N.Y. Mar. 28, 2023)).

To validly assert an injury under a price-premium theory, a plaintiff must "allege[] facts

demonstrating it is at least plausible that a plaintiff purchased a misbranded product."  *Hernandez*

---

[8] For four Plaintiffs, the Second Amended Complaint appears to additionally contemplate a theory of harm based on the "material risk" that the products contained PFAS.  *See* SAC ¶¶ 181, 191, 322, 335.  Plaintiffs do not rely on a risk-based theory of injury in their briefing, however.  Nor could they: the "mere risk that [a] product was contaminated with an injurious substance does not establish an economic injury."  *Brown v. Coty, Inc.* ("*Brown II*"), No. 22 Civ. 2696 (AT), 2024 WL 894965, at *4 (S.D.N.Y. Mar. 1, 2024) (internal quotation marks omitted) (alterations in original omitted)).

*v. Wonderful Co. LLC*, No. 23 Civ. 1242 (ER), 2023 WL 9022844, at *5 (S.D.N.Y. Dec. 29, 2023) (internal quotation marks omitted).  Where, as here, the misbranding allegations are that a product contained PFAS but was not labeled to reveal that presence, a plaintiff must plausibly allege that the purchased product was in fact "misbranded, *i.e.*, that [it] contained PFAS," to support a price-premium theory of injury.  *Onaka v. Shiseido Ams. Corp.* ("*Onaka II*"), No. 21 Civ. 10665 (PAC), 2024 WL 1177976, at *2 (S.D.N.Y. Mar. 19, 2024) (internal quotation marks omitted); *accord Lurenz v. Coca-Cola Co.*, No. 22 Civ. 10941 (NSR), 2024 WL 2943834, at *3 (S.D.N.Y. June 10, 2024); *see Kell v. Lily's Sweets, LLC*, No. 23 Civ. 147 (VM), 2024 WL 1116651, at *3 (S.D.N.Y. Mar. 13, 2024) ("Kell must . . . plausibly allege that she . . . purchased chocolate that contained lead.  Her theory of standing is that lead-contaminated chocolate is worth less than chocolate free from any amount of lead; unless she has a basis to allege that her chocolate contained lead, she has no basis to allege that she overpaid for her chocolate.").

An obvious way to do this is by testing the actual product that the plaintiff purchased; if the purchased product did not disclose the presence of PFAS yet testing revealed PFAS in that same product, then the plaintiff has sufficiently alleged that the product was misbranded.  *See Onaka II*, 2024 WL 1177976, at *2 ("The most direct route would be for Plaintiffs to test their own purchases for PFAS.").  Such direct proof is the cleanest and most effective way to establish such an injury.  Thus, there is no dispute here that Hicks has standing.  *See* SAC ¶¶ 125-126 (alleging that direct testing of three mascara tubes that Hicks actually purchased revealed the presence of PFAS).

Caselaw in this Circuit recognizes, however, that it may not always be possible to test the actual product purchased by a plaintiff.  Indeed, as alleged here, several "Plaintiffs had used the Waterproof Mascara Products and therefore were unable to have them tested."  *Id.* ¶ 128.  Thus,

in certain circumstances, a plaintiff may plausibly allege the presence of a contaminant in the purchase via indirect means, provided the plaintiff sufficiently links the results of independent testing of the same product line to the product actually purchased.

The leading case in this Circuit in this regard is *John v. Whole Foods Marketing Group, Inc.*, 858 F.3d 732 (2d Cir. 2017), which involved allegations that the plaintiff was overcharged at two Whole Foods stores in Manhattan in 2014 because he purchased products marked with inflated weight totals. *Id.* at 734. "The complaint [did] not identify a specific food purchase as to which Whole Foods overcharged" the plaintiff. *Id.* Instead, the plaintiff relied on a press release from the New York City Department of Consumer Affairs that announced that Whole Foods stores in New York City "routinely overstated the weights of its pre-packaged products" and noted that "89 percent of the packages tested" overstated their weights. *Id.* (internal quotation marks omitted). The investigation that gave rise to this press release "took place from fall 2014 to winter 2015, the same period in which [the plaintiff] allegedly" made the purchases in question. *Id.* at 735. Furthermore, "[t]he investigation focused on the eight Whole Foods stores operating in New York City during that period, which included the two stores that [the plaintiff] patronized." *Id.* The Second Circuit held that this plausibly alleged that the plaintiff suffered an injury-in-fact at the motion to dismiss stage. *Id.* at 738.

Accordingly, as reflected in *John*, it is not necessarily fatal to standing if the product actually purchased was not tested. But a plaintiff relying on indirect means to assert an injury-in-fact must "meaningfully link the results of their independent testing to" the products actually purchased. *Onaka II*, 2024 WL 1177976, at *2 (internal quotation marks omitted) (alteration in original omitted); *see Hernandez*, 2013 WL 9022844, at *4 (explaining that even if the plaintiff "did not actually test the bottle she purchased and consumed," she may be able to establish standing

if "the testing was reasonably near in time to her purchase"); *see also Hicks*, 2023 WL 6386847, at *8 (finding the Notre Dame Study particularly unhelpful because while Plaintiffs allegedly purchased L'Oréal products, the study was "not even alleged to have tested any L'Oréal products"). As one judge in this District put it, "[a]t the pleading stage, *John* permits a court to infer that the plaintiff purchased a specific product with a defect that had been plausibly reported by third-party tests to be widespread, systematic, routine, or uniform." *Kell*, 2024 WL 1116651, at *5 (citing *John*, 858 F.3d at 736-38).

Since *John*, district judges in this Circuit have considered various factors to determine whether a meaningful link exists between the results of testing and a plaintiff's actual purchases to allow the plausible inference of the presence of unlabeled contaminants.[9] Perhaps most significant is temporal proximity; any testing must have occurred "reasonably near in time" to the plaintiffs' purchases. *Onaka II*, 2024 WL 1177976, at *2 (citing *Clinger v. Edgewell Pers. Care Brands*, No. 21 Civ. 1040 (JAM), 2023 WL 2477499, at *4 (D. Conn. Mar. 13, 2023)); *see Kell*, 2024 WL 1116651, at *4 (rejecting testing where the complaint "lack[ed] any factual allegations about whether" the products in question were purchased at a "similar time" as those in the study on which the plaintiffs sought to rely); *Brown II*, 2024 WL 894965, at *4 n.3 (critiquing the plaintiffs for attempting to use the Notre Dame Study because they did not allege "the time period analyzed by" that study); *Hernandez*, 2023 WL 9022844, at *6 (commenting favorably on the

---

[9] As the Court explained in its prior Opinion, Plaintiffs' allegations that their purchased products contained detectable levels of PFAS that are premised only "[o]n information and belief," SAC ¶¶ 190, 201, 213, 225, 237, 249, 261, 273, 285, 297, 309, 321, 334, are insufficient to plead that those items contained PFAS for purposes of standing. *See Hicks*, 2023 WL 6386847, at *9 n.6. Establishing an injury through indirect means as laid out in *John* cannot be so easily circumvented by merely alleging the presence of a contaminant based on information and belief alone. And indeed, in opposing the pending motion to dismiss, Plaintiffs do not assert that they have established standing based only on such "[o]n information and belief" allegations.

allegation that "both the testing of the Product and [the plaintiff's] purchase occurred in July 2022"). The pleading also should disclose the number of samples tested, and the testing should involve more than a small number. *See Lurenz*, 2024 WL 2943834, at *4 ("Unlike the plaintiff in *John*, Plaintiff alleges that he tested only a single sample."); *Kell*, 2024 WL 1116651, at *4 (rejecting testing where it was "based on just two or three samples"); *Brown II*, 2024 WL 894965, at *4 (faulting the plaintiffs for failing to "allege how many lots or tubes of" the products in question "were tested"); *Esquibel v. Colgate-Palmolive Co.*, No. 23 Civ. 742 (LTS), 2023 WL 7412169, at *2 (S.D.N.Y. Nov. 9, 2023) (critiquing the plaintiffs for failing to allege how many units of the product in question were tested). To the extent relevant to the product at issue, courts also have considered the geographic proximity of the testing to the plaintiff's purchases. *See John*, 858 F.3d at 735 (noting that the investigation focused on eight Whole Food stores operating in New York City, including the two where the plaintiff had patronized); *see also Kell*, 2024 WL 1116651, at *4 (rejecting testing where the complaint "lack[ed] any factual allegations about whether" the products in question, chocolate bars, were purchased at a "similar . . . place" as those in the study on which the plaintiff sought to rely); *Esquibel*, 2023 WL 7412169, at *2 (critiquing the plaintiffs for failing to plead where the units tested were acquired). These factors, taken together, help a judge answer the ultimate question of whether "the presence of [the unlabeled contaminant] in the [products] is so widespread as to render it plausible that any Plaintiff purchased a mislabeled Product at least once." *Onaka II*, 2024 WL 1177976, at *2 (internal quotation marks omitted) (quoting *Onaka I*, 2023 WL 2663877, at *5).

With those guideposts in mind, the Court turns to whether the non-Hicks Plaintiffs have adequately pleaded an injury-in-fact through indirect means, beginning with the Notre Dame Study. As discussed in the Court's prior Opinion, significant obstacles preclude reliance on this

study to find an injury allegedly suffered by Plaintiffs.  *See Hicks*, 2023 WL 6386847, at *7.  First

and foremost, the "[r]esearchers did not identify which specific cosmetic products were tested . . .

identifying only the manufacturer and product type."  SAC ¶ 97.  While the Notre Dame Study

allegedly included mascaras manufactured by L'Oréal, there is no allegation that the study even

analyzed any of the specific product lines at issue in this case.  *See id.* ("Among the 231 products

analyzed were products, including mascara products, manufactured by L'Oréal.").  Second, testing

for fluorine, an indicator of the presence of PFAS, revealed that fifty-two percent of the tested

products had high fluorine levels, sixteen percent had moderate fluorine levels, and thirty-two

percent contained "low fluorine, or a level less than or equal to the level of detection."  *Id.* ¶ 98.

But the Second Amended Complaint does not allege into which category of fluorine concentration

level the tested L'Oréal products fell.  Likewise, there are no allegations as to whether any L'Oréal

products were among the twenty-nine selected for additional testing.  *See id.* ¶¶ 102-106.  Nor are

there allegations as to when the tested products were purchased, frustrating any ability to evaluate

temporal proximity with Plaintiffs' purchases.  The Notre Dame Study therefore is entitled to no

weight in assessing whether the non-Hicks Plaintiffs have sufficiently alleged that they suffered

an injury linked to their purchases.

The next testing occurred in late 2021, not long before the commencement of this action.

As discussed above, the Late 2021 Testing was conducted by an independent laboratory at the

behest of Plaintiffs and entailed testing one tube of each of the five Products.  And as also discussed

above, in the September 30, 2023 Opinion granting L'Oréal's first motion to dismiss, the Court

identified "glaring shortcomings" in the allegations as to this study that prevented it from

establishing Plaintiffs' standing.  *Hicks*, 2023 WL 6386847, at *8.  The Court noted that, while the

Late 2021 Testing "at least tested mascaras in the same product line as" Plaintiffs' purchases

24

(unlike the Notre Dame Study), "critical details [were] lacking as to that study's results," such as "how many products were tested . . . , whether all those tested products revealed the presence of PFAS, and if not, what percentage of the products had PFAS." *Id.* The Court also faulted Plaintiffs for not alleging in the Amended Complaint when the testing "occurred to allow an assessment of the proximity to Plaintiffs' purchases." *Id.*

The Second Amended Complaint addresses these criticisms of the Late 2021 Testing by alleging details that were previously lacking. The Second Amended Complaint now alleges, with regard to that testing, how many products were tested (one tube for each of the five Products), whether the tests revealed the presence of PFAS (they did), the percentage of the tested samples that had PFAS (100 percent), and the general timeframe of the testing (late 2021). SAC ¶¶ 114-118. As further alleged, two of those tubes—the tubes of L'Oréal Voluminous Lash Paradise Waterproof Mascara and Maybelline Volum' Express the Falsies Waterproof Mascara—additionally revealed the presence of PFAO. *See id.* ¶¶ 117-118. But even with these added details, the Late 2021 Testing still has shortcomings, though certainly not as fatal as the Notre Dame Study's. Plaintiffs do not allege, for instance, when the five sample mascara tubes were purchased, although presumably it would have been at some point in or before "late 2021" yet after the publication of the Notre Dame Study in June 2021, *id.* ¶ 96, given that the Late 2021 Testing was conducted after Plaintiffs reviewed that study, *id.* ¶ 113. The absence of more specific allegations as to the dates when the samples were purchased poses a challenge in assessing temporal proximity to Plaintiffs' purchases. In addition, the sample size for the Late 2021 Testing was small, as it involved only one tube of each Product. *Id.* ¶ 116. The study also did not entail any direct testing, as none of the products Plaintiffs actually purchased were analyzed. If only the results of the Late 2021 Testing were before the Court, these shortcomings might very well

preclude finding an alleged injury under a price-premium theory.  But any concerns as to the sufficiency of the Late 2021 Testing are largely ameliorated by the October 2023 Testing that followed the Court's September 30, 2023 dismissal of the Amended Complaint.

The October 2023 Testing was performed by a different independent laboratory and was more comprehensive than the Late 2021 Testing, involving four to five tubes of each of the five Products.  *Id.* ¶¶ 119-120.  These tests, as discussed above, detected PFAS in all of the tubes, with the overwhelming majority also containing PFAO concentrations well above the EPA health advisory level.  *Id.* ¶ 121.  In addition, as part of this testing, three mascara tubes actually purchased by Hicks—two tubes of Maybelline Great Lash Waterproof Mascara and one tube of L'Oréal Voluminous Waterproof Mascara—were tested and similarly came back with high levels of PFAS.  *Id.* ¶¶ 125-126.  These findings of PFAS levels in all mascaras tested as part of the October 2023 Testing therefore were consistent with the results of testing from about two years prior in late 2021.  Combining the results from the Late 2021 Testing and October 2023 Testing, thirty-two tubes of the Products were tested, with all of them revealing the presence of PFAS and twenty-seven of those tubes (or 84.375%) revealing the presence of significant levels of PFAO.  *See John*, 858 F.3d at 736-37 (finding an injury sufficiently pleaded where the plaintiff alleged that he was overcharged based on a press release announcing that eighty-nine percent of pre-packaged products from Whole Foods that were tested by the New York City Department of Consumer Affairs were mislabeled).  Plaintiffs' allegations pertaining to the October 2023 Testing, considered along with the allegations pertaining to the Late 2021 Testing, allow for the plausible

inference at this stage that there was a pervasive PFAS presence in the Products going back to "late 2021."[10]

The Court next turns to each Plaintiff whose standing remains at issue. And for them, the question boils down to the temporal proximity of their purchases to this testing.[11] For certain

---

[10] L'Oréal urges the Court to disregard the October 2023 Testing for lack of geographic proximity to where Plaintiffs made their purchases. *See* Motion at 4. As alleged, the samples of the Product analyzed in the October 2023 Testing were obtained "from multiple major retail outlets in New York City," SAC ¶ 119, yet many Plaintiffs are not alleged to have made their purchases in New York City. The Second Amended Complaint also alleges, however, that the Products were produced in a consistent manner through a standardized manufacturing process. *See id.* ¶¶ 159 ("Upon information and belief, [L'Oréal] utilizes, and has utilized throughout the class period, consistent manufacturing and production processes that ensure its cosmetic products, including the Waterproof Mascara Products, are of consistent quality across large-scale production runs."), 160 ("To achieve this, [L'Oréal] uses standardized manufacturing and production protocols designed to minimize variations in the production process. These protocols include strict quality control measures, standardized ingredient sourcing, and rigorous testing procedures to ensure that the final product meet[] the company's quality standards."), 161 ("Additionally, [L'Oréal] utilizes automated manufacturing processes, which reduce the risk of human error . . . ."), 162 ("These stringent quality control measures and standardized protocols ensure consistency in [L'Oréal]'s cosmetic products and ensure[] that [L'Oréal] understands all of the constituents of its final product, including the Waterproof Mascara Products."). The Court assumes the truth of these allegations at this stage of the litigation. It also is logical to assume that the mass production of mascara by "one of the largest cosmetic companies in the world," *id.* ¶¶ 19, 132, would be consistent regardless of the part of the country where the product is sold, unless there is a specific reason for particularized production in certain regions. It also is unsurprising that Plaintiffs would lack significant visibility into those manufacturing processes, especially at the pleading stage. *See id.* ¶ 32 ("[A]t all times pertinent hereto, [L'Oréal] kept its manufacturing process strictly confidential."). Thus, this is not a case where the failure to allege geographic proximity of testing is fatal to standing.

[11] For nine Plaintiffs, the Second Amended Complaint alleges the first purchase date and then that they purchased the Products during the "Class Period," using a capitalized term that is never defined in the Second Amended Complaint. SAC ¶¶ 210 (Pinghera), 222 (Ruggiero), 234 (Santiago), 258 (Simmons), 270 (Spring), 282 (Trembly), 306 (Vega), 318 (Cauchi), 330 (Branton). Presumably, Plaintiffs intend the "Class Period" to cover the particular timeframe alleged for the proposed nationwide class and the applicable proposed state subclasses, which is 2016 to December 3, 2023, for the Michigan and New Jersey subclasses, and 2018 to December 3, 2023, for the nationwide class and the other state subclasses. *See id.* ¶ 366. Even assuming that to be the case, the Second Amended Complaint largely does not allege when within those timeframes Plaintiffs made their last purchases. Thus, general allegations that purchases were made within the "Class Period" is of little help to the Court's temporal proximity analysis.

Plaintiffs, this analysis is straightforward.  Vargas allegedly made purchases going through the filing of the Second Amended Complaint, so she clearly has established standing.  *See* SAC ¶ 184 (alleging that "[f]or the last 10 years," Vargas has purchased Maybelline Volum' Express the Falsies Waterproof Mascara).  Cauchi and Branton allegedly made purchases of certain Products—Maybelline Great Lash Waterproof Mascara and L'Oréal Voluminous Waterproof Mascara for Cauchi, and L'Oréal Voluminous Lash Paradise Waterproof Mascara and Maybelline Volum' Express the Falsies Waterproof Mascara for Branton—through 2022.  *Id.* ¶¶ 316, 319, 328, 331.  They too have sufficiently alleged standing.

Meanwhile, other Plaintiffs have not established standing.  Several Plaintiffs do not even allege that they were still using any of the Products into late 2021.  As alleged, Davenport last purchased L'Oréal Voluminous Waterproof Mascara at some point in the summer of 2021, *id.* ¶ 199; Ruggiero began purchasing L'Oréal Voluminous Waterproof Mascara prior to 2018 and used that Product "until at least August 1, 2021," *id.* ¶¶ 220, 223; Secor began purchasing L'Oréal Voluminous Lash Paradise Waterproof Mascara prior to 2018 and used that Product "until at least October 1, 2021," *id.* ¶¶ 244, 247; Trembley began purchasing L'Oréal Voluminous Waterproof Mascara prior to 2018 and used that Product "until at least January 1, 2020," *id.* ¶¶ 280, 283; Turner began purchasing L'Oréal Voluminous Waterproof Mascara on or about January 1, 2016 and used that Product "until about January 1, 2020," *id.* ¶¶ 292, 295; and Vega began purchasing L'Oréal Voluminous Waterproof Mascara on or about January 1, 2016, and used that Product "for over a year or more," *id.* ¶¶ 304, 307.  The Second Amended Complaint does not allege when Ruggiero, Secor, Trembly, Turner, and Vega last purchased the Product—the relevant data point to assess temporal proximity—although obviously that last purchase would have occurred at some point prior to their last usage.  Given the sizable temporal gap between the date of any alleged last

purchase of a Product and the relevant testing, the allegations of the Second Amended Complaint do not allow for the plausible inference that any Product purchased by Davenport, Ruggiero, Secor, Trembley, Turner, or Vega contained PFAS.  The claims brought by these six Plaintiffs therefore are dismissed without prejudice for lack of subject matter jurisdiction.

That leaves four Plaintiffs—Pinghera, Santiago, Simmons, and Spring.  Although these individuals also do not allege when they last purchased the mascara, they at least allege to have continued using one of the Products through at least November 1, 2021.  As alleged, Pinghera began purchasing L'Oréal Voluminous Waterproof Mascara on or about January 1, 2020, and last used that Product on or about November 1, 2021, *id.* ¶¶ 208, 211; Santiago began purchasing L'Oréal Voluminous Waterproof Mascara prior to 2018 and used that Product "until at least January 1, 2022," *id.* ¶¶ 232, 235; Simmons began purchasing L'Oréal Voluminous Waterproof Mascara on or about January 1, 2001, and used that Product "until at least approximately January 2022," *id.* ¶¶ 256, 259; and Spring began purchasing L'Oréal Voluminous Waterproof Mascara on or about January 1, 2016, and used that Product "until at least November 1, 2021," *id.* ¶¶ 268, 271.  For these Plaintiffs, their last use of the Product (and thus, presumably, the date before then when they last purchased the Product) is close enough in proximity to the Late 2021 Testing to allow for a plausible inference that they purchased a Product that contained PFAS.

In sum, Davenport, Ruggiero, Secor, Trembley, Turner, and Vega have failed to sufficiently allege that they suffered an injury-in-fact to support a price-premium theory of liability.  Their claims are dismissed without prejudice.  Because among these Plaintiffs are the sole named Plaintiffs for the Seventh, Eighth, Ninth, Tenth, Twelfth, and Thirteenth Causes of Action, which assert claims under California, Iowa, North Carolina, and New Jersey state law, those causes of action are dismissed without prejudice.  *See Hyland v. Navient Corp.*, 48 F.4th

110, 118 (2d Cir. 2022) (holding that at least one "one named plaintiff [must] have standing with respect to each claim" (internal quotation marks omitted)); *see also Green v. Dep't of Educ. of City of New York*, 16 F.4th 1070, 1074 (2d Cir. 2021) (per curiam) ("When subject matter jurisdiction is lacking, the district court lacks the power to adjudicate the merits of the case, and accordingly Article III deprives federal courts of the power to dismiss the case with prejudice." (internal quotation marks omitted) (alteration in original omitted)); *John*, 858 F.3d at 735 ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice." (internal quotation marks omitted)).  Because Plaintiffs have sufficiently alleged standing for Hicks, Vargas, Pinghera, Santiago, Simmons, Spring, Cauchi, and Branton (the "Surviving Plaintiffs"), the Court turns to L'Oréal's Rule 12(b)(6) arguments for dismissal of the causes of action that implicate those Plaintiffs.

## B.    Preemption

L'Oréal first seeks dismissal under Rule 12(b)(6) on the grounds that Plaintiffs' claims are preempted by the federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, and regulations promulgated thereunder.  In doing so, L'Oréal relies on to the FDCA's broad preemption provision for cosmetic labels and packaging.  *See* Motion at 6-11.  That provision states that, with certain exceptions, "no State . . . may establish or continue in effect any requirement for labeling or packaging of a cosmetic that is different from or in addition to, or that is otherwise not identical with, a requirement specifically applicable to a particular cosmetic or class of cosmetics under this chapter" and two other federal laws.  21 U.S.C. § 379s(a).

When "a federal law contains an express preemption clause, [courts] focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent," and do not apply the usual presumption against preemption.  *Buono v. Tyco Fire Prods.,*

*LP*, 78 F.4th 490, 495 (2d Cir. 2023) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)).  But a federal statute's express pre-emption clause "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Id.* at 495-96 (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).  "[W]hen considering a preemption argument in the context of a motion to dismiss, the factual allegations relevant to preemption must be viewed in the light most favorable to the plaintiff." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 444 (2d Cir. 2015).  "A district court may find a claim preempted only if the facts alleged in the complaint do not plausibly give rise to a claim that is not preempted." *Id.*  "[T]he party asserting that federal law preempts state law bears the burden of establishing preemption." *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (quoting *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013)).  The question here therefore becomes whether "the state-law claims [Plaintiffs] assert[] . . . impose[] a labeling requirement that is 'different from' or 'in addition to' those provided by the FDCA." *Critcher v. L'Oréal USA, Inc.*, 959 F.3d 31, 36 (2d Cir. 2020).

L'Oréal accuses Plaintiffs of seeking to impose labeling requirements that are "in addition to" the labeling requirements mandated by federal law, rendering their claims preempted under 21 U.S.C. § 379s(a).  Motion at 6-10.  The argument is that federal law requires only the disclosure of "ingredients" in cosmetic products, yet Plaintiffs have not plausibly alleged PFAS to qualify as such with respect to the Products.  *Id.* at 10.  Plaintiffs respond, *inter alia*, that L'Oréal was required to include PFAS on the ingredients list under the governing federal regulations, so their state law claims are not preempted.  Opposition at 11-13.[12]

---

[12] L'Oréal maintains that the Second Amended Complaint's pleading that "there are no formal federal regulations governing what cosmetic labels must disclose," SAC ¶ 86, precludes

The Food and Drug Administration requires that "[t]he label on each package of a cosmetic shall bear a declaration of the name of each ingredient in descending order of predominance." 21 C.F.R. § 701.3(a). An ingredient is defined as "any single chemical entity or mixture used as a component in the manufacture of a cosmetic product." *Id.* § 700.3(e). "[I]ncidental ingredients that are present in a cosmetic at insignificant levels and that have no technical or functional effect in [a] cosmetic" do not have to be declared. *Id.* § 701.3(l). Incidental ingredients are defined as "[p]rocessing aids" and "[s]ubstances that have no technical or functional effect in the cosmetic but are present by reason of having been incorporated into the cosmetic as an ingredient of another cosmetic ingredient." *Id.* § 701.3(l)(1)-(2). L'Oréal argues that Plaintiffs have not alleged PFAS to be present in the products as a "component" used "in the manufacture of a cosmetic product," 21 C.F.R. § 700.3(e), but rather as "impurities," SAC ¶ 87, "degradation products," *id.*, or contaminants, *id.* ¶ 165, and federal regulations do not require the disclosure of such chemicals. Motion at 8.

To start, the Second Amended Complaint alleges, at least for purposes of this stage of the litigation, that the concentrations of PFAS present in the Products were not so small as to be dismissed as insignificant. As alleged, the October 2023 Testing revealed that all six tested L'Oréal Voluminous Waterproof Mascara tubes contained PFAS, with PFAO found in four of them at concentrations of 750 times the EPA health advisory level for two tubes, 1,000 times the advisory level for another tube, and 182 times the advisory level for the other tube; that all four tested L'Oréal Voluminous Lash Paradise Waterproof Mascara tubes contained PFAS, with PFAO

Plaintiffs from arguing that the additional labeling Plaintiffs seek to impose is in accordance with federal regulations. Motion at 9. Whether there are federal regulations on point is a legal conclusion that cannot be determined based only on allegations in a complaint. *See Iqbal*, 556 U.S. at 678.

found in all of them at concentrations ranging from 405 times to 810 times the EPA health advisory level; that all five tested Maybelline Volum' Express the Falsies Waterproof Mascara tubes contained PFAS, with PFOA found in all of them at concentrations ranging from 77 times to 315 times the EPA health advisory level; that all seven tested Maybelline Great Lash Waterproof Mascara tubes contained PFAS, with PFOA found in all of them at concentrations ranging from 70 times to 322 times the EPA health advisory level; and that all five tested Maybelline Total Temptation Waterproof Mascara tubes contained PFAS, with PFOA found in all of them at concentrations ranging from 295 to 510 times the EPA health advisory level. *See* SAC ¶¶ 121-122, 126.[13]

The Second Amended Complaint also alleges that PFAS are included in waterproof mascara as intentional ingredients because the chemicals make the product water-resistant. *See, e.g.*, *id.* ¶¶ 87 ("PFAS is present in cosmetic products as an intended ingredient and may be present as degradation products and impurities from the production of certain PFAS precursors used in certain products."); 90 ("When PFAS is present in a product describing itself as 'waterproof' or 'long-lasting,' it is likely [] an intentional ingredient, as PFAS provides hydrophobic, or 'water-resistant' qualities."). And each of the Products tested was in L'Oréal's line of waterproof mascaras. *Id.* ¶ 23. To the extent a dispute exists as to how PFAS made their way into the Products, and how that in turn bears on L'Oréal's disclosure obligations, that presents a question of fact not appropriate for resolution at the pleading stage.

---

[13] L'Oréal asks the Court to take judicial notice of two EPA releases, *see* Dkt. 51, in support of its argument that concentrations above the health advisory limit "simply means that the EPA is unable to make its health assurance about a lifetime of drinking that water, not that drinking it is dangerous." Motion at 18 n.8. Even were the Court to take judicial notice of these materials, the Court is not persuaded by this interpretation of the EPA guidance as it pertains to the question of whether the PFAS detected in the Products were at levels so small as to be insignificant.

Viewing the allegations in the light most favorable to the Surviving Plaintiffs, their claims accord with federal regulations by seeking to hold L'Oréal liable for not identifying either an intentional ingredient or an incidental ingredient present in sufficient levels to require disclosure under federal law. *See O'Connor v. Henkel Corp.*, No. 14 Civ. 5547 (ARR), 2015 WL 5922183, at *5 (E.D.N.Y. Sept. 22, 2015) ("It is well-established that 'the FDCA does not preempt state laws that allow consumers to sue manufacturers that label or package their products in violation of federal law.'" (quoting *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 757 (9th Cir. 2015))). L'Oréal has therefore failed to carry its burden of demonstrating that the surviving claims are preempted.[14]

## C.    Reasonable Expectations

In support of their overarching price-premium theory, the Surviving Plaintiffs assert that "[a] reasonable consumer would not have paid the price premium for the Products if they had known that the Waterproof Mascara Products contained PFAS," SAC ¶ 346, and that reasonable consumers in fact "would have refused to purchase the Waterproof Mascara Products entirely if they had known that the Products contained PFAS," *id.* ¶ 347.  The Second Amended Complaint further alleges that any such reliance was reasonably foreseeable to L'Oréal, maintaining that "[a]ny reasonable consumer would consider the packaging and labeling of a cosmetic product," *id.* ¶ 350, and that "[c]onsumers reasonably relied upon [L'Oréal]'s misleading packaging claims as objective statements that communicated, represented, and advertised that the Waterproof Mascara Products had specific product characteristics," *id.* ¶ 351.  In their motion, L'Oréal argues

---

[14] Given this conclusion on preemption, the Court need not reach at this juncture whether the Surviving Plaintiffs may pursue a theory of liability based on the presence of PFAS in the products as a result of "impurities," SAC ¶ 87, "degradation products," *id.*, or contaminants, *id.* ¶ 165.

that the Second Amended Complaint should "dismiss[ed] in total because the liability theory animating each cause of action lacks a plausible basis in the objective expectations of [a] reasonable consumer."  Motion at 12.  The Company's argument continues, "each claim ultimately rests of Plaintiffs' assumption that their mascaras had no chance of containing any trace of PFAS," yet the Second Amended Complaint "pleads no plausible basis for such an expectation."  *Id.*

L'Oréal advances four arguments challenging the reasonableness of Plaintiffs' expectations:[15] (1) neither the Products' labeling statements nor their ingredient lists form the basis for an objective expectation that the mascaras did not contain a detectable level of PFAS, *id.* at 13-16; (2) Plaintiffs' allegations that PFAS are widespread undercuts the notion that a reasonable customer could expect the Products not to contain PFAS, *id.* at 16-18; (3) Plaintiffs have not sufficiently alleged that PFAS in mascaras is harmful, *id.* at 18-20; and (4) Plaintiffs cannot succeed on an omissions-based theory because the Second Amended Complaint does not allege that L'Oréal knew PFAS chemicals were in the Products when Plaintiffs purchased them, *id.* at

---

[15] L'Oréal's moving brief also includes a terse, passing mention of its belief that the Second Amended Complaint runs afoul of Rule 9(b) of Federal Rules of Civil Procedure, *see* Motion at 20, presumably aimed at least in part at Plaintiffs' Fifth Cause of Action for fraudulent concealment, *see, e.g.*, *Hodges v. Glenholme Sch.*, 713 F. App'x 49, 51 (2d Cir. 2017) ("The elements of fraudulent concealment must be pled with particularity under Rule 9(b)."). *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). The Court does not reach this argument, where L'Oréal has done so little to develop it. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)). The Court notes, however, that the Second Amended Complaint repeatedly alleges that L'Oréal advertised, labeled, and sold the Products; that the Products contained PFAS; that L'Oréal knew or should have known that PFAS was in the Products; and that L'Oréal failed to disclose that fact on the packaging for the Products. *E.g.*, SAC ¶¶ 32, 93, 139, 142, 143, 146-151, 153-156, 164-168, 354-356; *see Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (explaining that Rule 9(b) "require[s] that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent'" (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993))).

20-23.[16]  Although L'Oréal does not specify to which causes of action these arguments apply, they

only present caselaw governing New York consumer protection law.  *See* Motion at 12.  The Court

therefore treats L'Oréal's arguments in this regard as seeking dismissal of only the First, Second,

Third, and Fourth Causes of Action insofar as they are asserted under New York law.[17]

To state a claim under New York General Business Law Sections 349 and 350 (the First

and Second Causes of Action), "a plaintiff must allege that a defendant has engaged in (1)

consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury

as a result of the allegedly deceptive act or practice." *Eidelman v. Sun Prods. Corp.*, No. 21-1046-

cv, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022) (quoting *Orlander v. Staples, Inc.*, 802 F.3d

289, 300 (2d Cir. 2015)).  This requires a plaintiff to "establish that [the defendant]'s allegedly

deceptive advertisements were likely to mislead a reasonable consumer acting reasonably under

the circumstances." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013); *see also*

*Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018) (applying this standard to claims under

---

[16] L'Oréal also asserts that the statements on its website are inactionable puffery.  Motion at 13-14.  In their Opposition, Plaintiffs clarify that they "do not contend that the website statements are the misrepresentations and omissions forming the basis for their claims." Opposition at 15 n.13.  Rather, Plaintiffs contend that they invoke those statements as "context" for their claims.  *See id.*  Accordingly, the Court does not consider whether those website statements would have misled a reasonable consumer.

[17] The Fifth and Sixth Causes of Action—for fraudulent concealment and unjust enrichment—do not have a reasonable expectation requirement. *See Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 234 (S.D.N.Y. 2015) (noting that, in New York and many other states, "the basic elements of a fraudulent concealment claim are generally: (1) a duty to disclose on the part of defendant; (2) concealment or failure to disclose by defendant; (3) reliance by the plaintiff (or inducement of plaintiff to act); (4) damages; and (5) proximate causation"); *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 591 (S.D.N.Y. 2021) ("To sufficiently plead unjust enrichment, a plaintiff must allege that (1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) . . . it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff." (internal quotation marks omitted)).

Section 349 and 350).[18]  A claim for breach of an express warranty (the Third Cause of Action) "requires a plaintiff to allege that the defendant made an affirmation of fact or promise which was false or misleading when made and which had a natural tendency to induce a buyer to purchase the offending product, and that the plaintiff relied on the express warranty to her detriment." *Brown v. Coty, Inc.*, No. 22 Civ. 2696 (AT), 2023 WL 2691581, at *2 (S.D.N.Y. Mar. 29, 2023). This requires the plaintiff to "point to a specific, express statement that is false or misleading and that a reasonable consumer can interpret as a material claim about the product." *Id.* A determination regarding the expectation of a reasonable consumer may also affect a breach of implied warranty claim (the Fourth Cause of Action). *See, e.g.*, *Schleyer v. Starbucks Corp.*, No. 22 Civ. 10932 (JPO), 2023 WL 5935695, at *5 (Sept. 12, 2023) (noting that, where "the Plaintiffs have plausibly alleged that [the defendant's] representations could mislead a reasonable consumer," the implied warranty claim would survive in the absence of other developed arguments). "While it is well settled that in appropriate circumstances, a court may determine at the motion to dismiss stage that an allegedly deceptive misrepresentation would not have misled a

---

[18] As discussed, Simmons also has adequately alleged standing to pursue the Eleventh Cause of Action under the Michigan Consumer Protection Act. That statue similarly prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. Laws § 445.903(1). Such conduct includes, as relevant here, "[r]epresenting that goods or services have . . . characteristics [or] ingredients . . . that they do not have," *id.* § 445.903(1)(c), "[r]epresenting that goods or services are of a particular standard . . . if they are of another," *id.* § 445.903(1)(e), "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not be reasonably known by the consumer," *id.* § 445.903(1)(s), "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is," *id.* § 445.903(1)(bb), and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner," *id.* § 445.903(1)(cc). A misrepresented fact is material if it is "important to the transaction" or if it "affect[s] the consumer's decision to enter into the transaction," whereas with respect to omissions, the inquiry is "whether the consumer could reasonably be expected to discover the omission at issue.'" *In re General Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 420-21 (S.D.N.Y. 2017) (quoting *Zink v. Chrysler Corp.*, 236 Mich. App. 261, 600 N.W.2d 384, 398 (1999)).

reasonable consumer as a matter of law, multiple courts have indicated that such relief should rarely be granted, . . . because the question of whether a representation is materially misleading is generally a question of fact not suited for resolution at the motion to dismiss stage." *Colpitts*, 527 F. Supp. 3d at 581 (collecting cases) (internal quotation marks omitted) (citations omitted).

The Second Amended Complaint sufficiently pleads allegations that support an objective expectation that the mascaras did not contain a detectable level of PFAS. Plaintiffs allege that PFAS are "toxic to humans at extremely low levels[,] . . . [and are] associated in the medical and scientific literature with harmful and serious health effects in humans and animals." SAC ¶ 66. Plaintiffs point to the following health issues in this regard:

> (a) altered growth; (b) impacts to learning and behavior of infants and older children; (c) lowering a woman's chance of getting pregnant; (d) interference with the body's natural hormones; (e) increased cholesterol levels; (f) modulation of the immune system; (g) testicular and kidney cancers; (h) thyroid disease; (i) high uric acid levels; (j) elevated liver enzymes; (k) ulcerative colitis; [] (l) pregnancy-induced hypertension; (m) increased allergic diseases and sensitivity to allergens; (n) dermatitis; (o) eye disease; (p) dermal irritation; and (q) eye irritation.

*Id.* Plaintiffs also alleges that "PFAS exposure is positively correlated with certain metabolic diseases, such as diabetes, overweight [sic], obesity, and heart disease," that "exposure to PFAS may impact the immune system and reduce antibody response to vaccines," and that "[w]omen exposed to PFAS during pregnancy have higher risks of gestational diabetes and preeclampsia, and their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face an increased risk of childhood obesity and infections." *Id.* ¶¶ 67-69. And as for PFOA, which was detected in 84.375% of the tubes of the Products tested in late 2021 and October 2023, Plaintiffs allege that PFOA "is toxic in extremely small quantities" and that "[t]he EPA has characterized PFOA as a 'likely carcinogen' and designated the chemical a 'hazardous substance' under the Comprehensive Environmental Response, Compensation, and Liability Act." *Id.* ¶ 25.

Five ailments in Plaintiff's parade of maladies—*i.e.*, "increased allergic diseases and sensitivity to allergens," "dermatitis," "eye disease," "dermal irritation," and "eye irritation"—are particularly relevant to the representations that L'Oréal made on its packaging.  Plaintiffs allege that PFAS chemicals are associated with increased allergic diseases and sensitivity to allergens, yet the packaging for the L'Oréal's Voluminous Lash Paradise Waterproof Mascara stated that it was "allergy tested," *id.* ¶ 154, and the packaging for the Maybelline Great Lash Waterproof Mascara represented that it was "hypoallergenic," *id.* ¶ 156.  Plaintiffs allege that PFAS chemicals are associated with eye irritation, which a reasonable consumer might find inconsistent with the representations that L'Oréal's Voluminous Lash Paradise Waterproof Mascara was "[s]uitable for sensitive eyes," *id.* ¶ 154, that Maybelline Volum' Express the Falsies Waterproof Mascara and Maybelline Total Temptation Waterproof Mascara were "[s]uitable for contact wearers," *id.* ¶ 155, and that Maybelline Great Lash Waterproof Mascara was "contact lens safe," *id.* ¶ 156.  Likewise, a reasonable consumer might consider the possibility of eye irritation to be inconsistent with the representation that L'Oréal's Voluminous Lash Paradise Waterproof Mascara, Maybelline Volum' Express the Falsies Waterproof Mascara, and Maybelline Total Temptation Waterproof Mascara were "ophthalmologist tested."  *Id.* ¶¶ 154-155.

At this juncture, the question is whether "*no* reasonable consumer would believe" that the Products did not contain PFAS.  *Colpitts*, 527 F. Supp. 3d at 583 (emphasis added).  Given the allegedly serious health conditions associated with PFAS exposure, and PFAO exposure in particular, as well as the tension between various representations of the packaging of the Products and the alleged health risks posed by PFAS, the Surviving Plaintiffs sufficiently allege the expectations of a reasonable consumer at this stage.

L'Oréal's remaining arguments on the question of reasonable consumer expectations are unavailing. Its argument that PFAS are ubiquitous so no reasonable consumer could have expected the Products not to contain it is not persuasive in light of the alleged serious health risks discussed above, along with certain assurances and representations made on the packaging of the Products. L'Oréal's argument that Plaintiffs have not sufficiently alleged PFAS chemicals to be harmful— an argument that is dubious on its face given the aforementioned alleged health risks—fails because this is not a personal injury action. Plaintiffs' claims are premised on the notion that they were misled by L'Oréal into believing the Products they purchased did not contain PFAS chemicals and therefore paid more than they would have otherwise. For such claims, "a showing of personal injury" is "not require[d]." *Harris v. Pfizer*, 586 F. Supp. 3d 231, 239 (S.D.N.Y. 2022) (citing *Bellevue S. Assocs. v. HRH Constr. Corp.*, 579 N.E.2d 195 (N.Y. 1991)). Finally, L'Oréal's omission-based argument fails because the Second Amended Complaint repeatedly alleges that L'Oréal knew or should have known that PFAS were in the Products and that PFAS had harmful effects. *See, e.g.*, Am. Compl. ¶¶ 93, 158, 165, 166, 168, 344. Moreover, this omission-based argument, even if successful, would not result in dismissal of the surviving consumer protection claims given the misrepresentation theory pleaded.

## D.  Third Through Sixth Causes of Action

The Court now turns to L'Oréal's additional arguments challenging the four claims brought by the Surviving Plaintiffs in the Third through Sixth Causes of Action. These claims are for breach of express warranty, breach of implied warranty, fraudulent concealment, and unjust enrichment. *See* SAC ¶¶ 406-439.

40

### 1.    Express Warranty

L'Oréal argues that the express warranty claim, pleaded in the Third Cause of Action, fails for lack of pre-suit notice, citing the standard under New York law.  Motion at 24.  L'Oréal is correct that under New York law, "a plaintiff must . . . give notice of the breach [of the express warranty] to the seller before he can recover under an express warranty claim."  *Colpitts*, 527 F. Supp. 3d at 589 (citing N.Y. U.C.C. § 2-607(3)(a)).  This notice requirement applies to consumer fraud actions such as this case.  *See id.*  Plaintiffs, however, do not allege or argue that they provided any form of pre-suit notice to L'Oréal.  Indeed, perhaps recognizing this infirmity, Plaintiffs purport to voluntarily withdraw this Cause of Action to the extent asserted under New York law.  Opposition at 24 n.17.  Accordingly, Plaintiffs' Third Cause of Action to the extent asserted under New York law is dismissed.  The Surviving Plaintiffs, however, also include Simmons whose express warranty claim is brought under Michigan law.  Because L'Oréal presents no argument for the dismissal of the Third Cause of Action under Michigan law, the claim survives insofar as it is brought by Simmons under Michigan law.

### 2.    Implied Warranty

The Fourth Cause of Action asserts a claim for breach of implied warranty.  Here too, New York law applies to the implied warranty claim brought by each of the Surviving Plaintiffs except Simmons, whose claim is governed by Michigan law.  "Under New York law, a plaintiff must allege privity with the defendant for a claim of breach of an implied warranty."  *Colpitts*, 527 F. Supp. 3d at 591.  No Plaintiff is alleged to have purchased the Products directly from L'Oréal, so privity is lacking.  Plaintiffs also purport to withdraw this Cause of Action to the extent asserted under New York law.  Opposition at 24 n.17.  Accordingly, Plaintiffs' Fourth Cause of Action is dismissed insofar as it is brought under New York law.  Yet again, L'Oréal makes no argument

for dismissal of the Fourth Cause of Action under Michigan law, so it survives to the extent asserted by Simmons.

### 3.    Fraudulent Concealment

L'Oréal's motion to dismiss does not address the Fifth Cause of Action, brought for fraudulent concealment, aside from a single parenthetical in a string cite in the midst of its argument regarding reasonable consumer expectations, *see* Motion at 20-21, and, arguably, its passing contention that the Second Amended Complaint runs afoul of Federal Rule of Civil Procedure 9(b), *see id.* at 20.  Both are insufficiently developed to provide a basis for granting L'Oréal's motion.  *See supra* n.15.  Accordingly, the Fifth Cause of Action, to the extent brought by the Surviving Plaintiffs, survives dismissal.

### 4.    Unjust Enrichment

Finally, in the Sixth Cause of Action, Plaintiffs allege that L'Oréal has been unjustly enriched as "the intended and expected result of the conscious wrongdoing alleged" in the Second Amended Complaint.  SAC ¶ 434.  Again, New York law applies to whether Hicks, Vargas, Pinghera, Santiago, Spring, Cauchi, and Branton have adequately pleaded this claim, while Michigan law controls the question as to Simmons.  And here too, L'Oréal only presents arguments under New York law.  Plaintiffs do not allege any distinct factual bases for the Sixth Cause of Action, instead incorporating by reference all the other factual allegations in the Second Amended Complaint.  *Id.* ¶¶ 433-439.  To sufficiently plead unjust enrichment under New York law, a plaintiff must allege that "(1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) . . . it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff."  *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 290 (S.D.N.Y. 2014) (quoting *Baron v. Pfizer, Inc.*, 840 N.Y.S.2d 445, 448 (3d Dep't 2007)).  "[A]n unjust enrichment claim

cannot survive 'where it simply duplicates, or replaces, a conventional contract or tort claim.'" *Id.* (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790-91 (2012)).

Without any unique factual allegations supporting the unjust enrichment claim brought by Hicks, Vargas, Pinghera, Santiago, Spring, Cauchi, and Branton "must be dismissed because it merely duplicates [their] other claims." *Colpitts*, 527 F. Supp. 3d at 592. The claim is a "mere repackaging of [Plaintiffs'] other claims based on the alleged misrepresentations on the Product[s]' packaging." *Id.* Accordingly, Plaintiffs' Sixth Cause of Action is dismissed insofar as it is brought under New York law. But once again, L'Oréal presents no argument for dismissal of the unjust enrichment claim under Michigan law, so the Sixth Cause of Action survives to the extent it is brought by Simmons.

### E.     Leave to Amend

Finally, the Court considers whether to grant Plaintiffs leave to amend yet again. Plaintiffs have not requested leave to file another amended complaint in their briefing. Accordingly, the Court declines to *sua sponte* grant leave to amend. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 126 (2d Cir. 2013) ("While leave to amend under the Federal Rules of Civil Procedure is freely granted, no court can be said to have erred in failing to grant a request that was not made." (internal quotation marks omitted)).

### IV.  Conclusion

For the foregoing reasons, L'Oréal's motion is granted in part and denied in part. Plaintiffs' Seventh, Eighth, Ninth, Tenth, and Twelfth Causes of Action are dismissed without prejudice for lack of standing. Plaintiffs' Third, Fourth, and Sixth Causes of Action are dismissed with prejudice for failure to state a claim insofar they are asserted by Plaintiffs Zaida Hicks, Stephanie Vargas, Stephanie Pinghera, Marjie Santiago, Nancy Spring, Sonia Cauchi, and Stephanie Branton, these

causes of action survive dismissal to the extent they are brought by Plaintiff Gwendolyn Simmons under Michigan law, and they are dismissed without prejudice to the extent they are brought by Plaintiffs who lack standing.  The First, Second, Fifth, and Eleventh Causes of Action survive to the extent they are brought by Plaintiffs Zaida Hicks, Stephanie Vargas, Stephanie Pinghera, Marjie Santiago, Gwendolyn Simmons, Nancy Spring, Sonia Cauchi, and/or Stephanie Branton, and these causes of action are dismissed without prejudice to the extent they are brought by Plaintiffs who lack standing.

The Clerk of Court is respectfully directed to close Docket Number 49 and to terminate from this case as Plaintiffs Sumner Davenport, Karrie Ruggiero, Kathleen Secor, Heidi Trembley, Lisa Turner, and Rebecca Vega.

SO ORDERED.

Dated: September 19, 2024
         New York, New York

_____
            JOHN P. CRONAN
        United States District Judge